356 F.Supp. 413 (1972)
John W. WALLER and Esther M. Waller, Defendants,
v.
FORT DODGE LABORATORIES, a Division of American Home Products Corporation, a corp., Plaintiffs.
No. 70 C 434(3).
United States District Court, E. D. Missouri, E. D.
June 30, 1972.
Ruppert & Schlueter, Clayton, Mo., for plaintiffs.
*414 Evans & Dixon, St. Louis, Mo., for defendant.

FINDINGS OF FACT
WEBSTER, District Judge.
1. Plaintiffs, residents of Missouri, are owners of a registered herd of Black Angus cattle. Defendant, an Iowa corporation with its principal office in that state, is the manufacturer under exclusive license of a patented vaccine which is called Anaplaz and which prevents the symptoms of a common bovine disease called anaplasmosis. Plaintiffs' unit seeks damages for loss of calves and loss of market value of their herd by reason of death occurring within a few days after birth of a number of their calves caused by a blood disease known as neonatal isoerytholysis. Plaintiffs claim that this disease was directly caused by use of the vaccine Anaplaz, and by Second Amended Complaint seek damages in amount of $74,500. Defendant denies that the vaccine caused the deaths or any loss or damage to the plaintiffs.[1]
2. The issues are essentially factual and involve the relationship of the vaccine Anaplaz to the diseases anaplasmosis and neonatal isoerytholysis.
3. On the dates of the incidents in question, the plaintiffs owned from 85 to 100 brood cows; which were contained on three farms in an area in and around Sullivan, Missouri; and prior to April 23, 1968, the plaintiffs' herd was virtually trouble-free with respect to disease or sickness. Prior to April 23, 1968, the Waller herd had received the customary shots associated with cattle diseases and the herd in general suffered very few problems, except for occasional calf losses from young heifers and from occasional cases of pneumonia.
4. Anaplaz was first marketed in 1965. In 1966, a cow in plaintiffs' herd contracted anaplasmosis and plaintiffs, relying upon literature published by the defendant and the advice of their veterinarian, decided to vaccinate the herd with Anaplaz. The first inoculation was on October 28, 1966, and was followed by a second vaccination on April 11, 1967, both being required to provide immunity. There is no question but that the vaccine used in these (and a following booster inoculation) had not been changed following sale by defendant, and all vaccinations were administered in accordance with the manufacturer's instructions. Those instructions suggested a booster inoculation was required annually, before the disease season, and plaintiffs' herd was given a booster inoculation in accordance with those instructions on April 13, 1968.
5. The disease, anaplasmosis, is a disease which infects mature cattle primarily in the humid and warm areas of the United States. It is caused by a tiny parasitic microorganism, the anaplasma marginale, which is transmitted primarily by flying insects. It attacks the red blood cells of the cow and will frequently produce death in older cattle by destruction of the red blood cells, producing an extremely anemic condition.
6. Soon after June 1, 1968, the Waller herd began experiencing calf deaths shortly after birth. The calves appeared to be born healthy, and within one-half to five days became sick and died. The calves exhibited uniform symptoms, appearing very jaundiced, languid, and extremely weak, and with the membranes and skin taking on a very yellow and jaundice appearance. This same description was provided by J. Schmidt, caretaker of the Waller herd, and by Dr. Charles Counts, DVM. Necropsies were performed by Dr. Stuart Nelson, DVM, Dr. Loren D. Kintner, and Dr. Charles Counts, DVM, each of them finding the animals in an extremely yellow and jaundice condition. The calves were diagnosed as having neonatal isoerytholysis ("NI"), a form of hemolytic anemia.
7. Neonatal isoerytholysis can result under the following set of circumstances: *415 A red blood cell antigen must be introduced into the dam or brood cow and that cow's system must produce antibodies to such antigen. If a cow is then bred to a bull having a blood characteristic similar to such antigen and if the cow has made antibodies to combat such antigen, and if at the time of birth the calf has inherited the bull's blood characteristics, then, when the calf sucks the cow's colostrum, the colostrum or first milk will convey the hostile antibodies to the calf. These antibodies will attack the calf's red blood cells and produce neonatal isoerytholysis, which is the lysing of the red blood cells.
8. The central issue of fact is whether Anaplaz caused the NI in plaintiffs' herd. The parties agree that NI results from the destruction of red blood cells caused by antibodies to those cells which the calf obtains from the first milk, or colostrum, of the mother cow. It is plaintiffs' contention that the antibodies which are responsible form in the cow because of the presence of red blood cell antigens which are contained in Anaplaz. Defendant contends that Anaplaz does not stimulate production of red cell antibodies, but that they are produced naturally in the cow's system. While NI has been known to exist in folds and in swine for many years, most of the literature on NI in calves has developed since 1968.
9. Plaintiffs' chief witness on this decisive issue, that is, whether red cell constituents in Anaplaz vaccine stimulated production of antibodies in the cows which thereafter led to NI in the calves, was Dr. Stuart Nelson, a veterinarian with a master's degree in pathology, who is associated with the University of Missouri School of Veterinary Medicine. Upon hypothetical question, he testified that the red blood cell residual, or stroma, in the Anaplaz vaccine was the cause of NI in plaintiffs' herd. Further evidence indicated that neonatal isoerytholysis had not been diagnosed in cattle prior to the introduction of the vaccine, Anaplaz, manufactured by the Fort Dodge Laboratories. (The defendant produced one witness who indicated that possibly fifteen or twenty years before he might have observed one calf with similar symptoms, but admitted that it was not diagnosed as NI.) All of the herds in which neonatal isoerytholysis has been diagnosed, had been vaccinated with the Anaplaz vaccine produced by Ford Dodge Laboratories, with one exception. Testimony as to the other history surrounding that herd, including the possibility of blood transfusions, was lacking.
10. The calf deaths in question commenced within thirty days after the third shot of Anaplaz, with the death rate at its highest point for the following six months. The losses diminished substantially in the following years, so that in 1971, only one calf was lost. No other herds in the area of Sullivan, Missouri, have been vaccinated with the Anaplaz vaccine and no other herds have experienced losses as a result of neonatal isoerytholysis. One herd, located in Cuba, Missouri, approximately twenty miles from the Waller herd, was vaccinated by Dr. Counts with the Anaplaz vaccine, and thereafter suffered losses from neonatal isoerytholysis.
11. Dr. Nelson's opinion that the red blood cell residual, or stroma, in the Anaplaz vaccine caused the NI in the Waller calves assumed one important factthat Anaplaz contained anaplasma antigens. This assumption was confirmed by the testimony of Robert Dahlgren, DVM, an experienced pathologist and immunologist. Dr. Dahlgren testified that the vaccine in question was made from the whole blood of cattle infected with anaplasmosis. He testified that the patent called for centrifuging the blood cells at 20,000 r. p. m. to obtain release and sedimentation of the anaplasma marginale, the microorganism which produces anaplasmosis. He further testified that when operating the centrifuge at that speed red blood cell antigens would also be caused to sedimentate and be removed along with the anaplasma marginale matter. He further testified that the patent did not provide for removing the red blood cell antigens from the vaccine at *416 any time during the manufacturing process. Dr. Searl, for defendant, testified each dose of Anaplaz contained 1 mg. of red cell stroma. Dr. David, for the defendant, testified that Anaplaz contains some red cell stroma, although in his opinion it would not cause neonatal isoerytholysis. Dr. David's opinion was based upon tests done with very limited unvaccinated herds, numbering five or six animals, which is hardly a representative test of a disease which occurs in bovines once in six thousand births.
12. Defendant offered further testimony that the antibodies which do cause NI are naturally stimulated. The essence of this testimony was that numerous elements found naturally in the environment, for example feedstuffs, contained antigens to red blood cells, and that more particularly the anaplasma marginale organism carried with it antigens to red blood cells. It was defendant's theory that under field challenge to the anaplasma marginale, which would be a living-cell antigen under repeated stimulation, antibodies to red blood cells would be produced. The court finds that defendant's evidence in these respects is persuasive only as a possible phenomenon and is not convincing evidence of the cause of NI in the Waller herd, taking into account all of the facts and circumstances in evidence. Defense testimony that red cell antigens in the stroma of Anaplaz were less likely to produce antibodies than environmental antigens (defendant's alternate theory of causation) was disputed by Dr. Mark F. Young. Dr. Young testified that in a breeding experiment using bulls known to have sired NI calves, 90% of calves born to cows previously vaccinated with Anaplaz showed antibodies, whereas only 9% of calves whose dams had not been vaccinated showed antibodies.
13. The court finds by the preponderance of the credible evidence that Anaplaz caused the NI deaths complained of.
14. Thirty-six calves valued at $400.00 each died in the course of three years, for a total value of $14,400.00, minus approximately $40.00 per calf for raising the calf to weaning age, or $12,960. Ten cows were shipped during the year 1968 at a value which was diminished by reason of shipping in the amount of $200.00 per cow, for a total loss of $2,000.00. One calf lost in 1971, as the result of death, was valued in the amount of $1,500.00. Forty-eight remaining cows were diminished in value at $250.00 per cow, for a total of $12,000.00. The total aggregate loss was in the amount of $28,460.00.

CONCLUSIONS OF LAW
1. By reason of diversity of citizenship and the amount in question, this court has jurisdiction. 28 U.S.C.A. § 1332(a).
2. The defendant sold a product (Anaplaz vaccine) in a defective condition, reasonably dangerous to those who would normally be expected to use it or to their property. Keener v. Dayton Electric Manufacturing Company, 445 S.W.2d 362 (Mo.1969). Restatement of Torts 2nd § 402A.
3. Plaintiffs abandoned their claim for punitive damages. In any event, the court holds that plaintiffs failed to establish such charge by the evidence.
4. The seller of the vaccine, Fort Dodge Laboratories, is in the business of producing the said vaccine and other similar pharmaceuticals, and the vaccine in this case reached the consumer, John W. Waller and Esther M. Waller, without substantial change in its condition in which it was sold.
5. Plaintiffs are entitled to recover from defendant the amount of damages proximately caused by the defective condition of defendant's product, which the court finds to be $28,460.00.
6. The clerk will enter judgment in favor of the plaintiffs and against defendant in the amount of $28,460.00. Costs assessed against defendant.
So ordered.
NOTES
[1] Plaintiffs also allege facts upon which they based a claim for punitive damages, but by not offering proof of those charges nor carrying that claim to their brief, the issue of punitive damages has been abandoned.