**WOOD PRODUCTS, INC., Plaintiff,**

v.

**CMI CORPORATION, et al.,
Defendants/Third Party
Plaintiffs,**

v.

**DRESSER INDUSTRIES, INC., et al.,
Third Party Defendants.**

**Civ. No. JFM–82–2400.**

United States District Court,
D. Maryland.

Oct. 10, 1986.

William Dunn, Jr., Dunn & Emig, Greenbelt, Md., for plaintiff.

Edward Digges, Jr., Annapolis, Md., for Dresser Industries.

James P. Ulwick, Kramon & Graham, Baltimore, Md., for CMI.

James Constable, Baltimore, Md., for Angelo.

Michael May, Baltimore, Md., for Chiz Bros.

## MEMORANDUM

MOTZ, District Judge.

This action (pending since August 1982) arises from the failure of a piece of heavy industrial equipment known as an Angelo Rotary Furnace System to perform its intended function of converting wood waste products into char for the purpose of making commercial charcoal. Plaintiff is Wood Products, Inc., the purchaser of the furnace. The defendants are CMI Corporation, the manufacturer of the furnace, and James F. Angelo, II, the originator of the concept of the Angelo furnace.[1] CMI joined as third party defendants Harbison-Walker Refractories Division of Dresser Industries, Inc., the manufacturer of the refractory used in the furnace, Chiz Brothers, Inc., the vendor of the refractory, and Bruce L. Winter and Universal Energy International, Inc., an individual and corporation which performed work in connection with the design and manufacture of the furnace. By virtue of a series of pretrial rulings, the case proceeded to trial only on plaintiff's claims against CMI and Angelo

---

1. Plaintiff also sued Contract Manufacturing, a unit of the Automated Division of CMI, which performs subcontract manufacturing. Contract Manufacturing is not a separate legal entity and Contract Manufacturing and CMI will be referred to collectively as "CMI"

·and on CMI's claims against Harbison-Walker. During the course of the trial, in light of the precarious financial condition of Angelo which made it extremely burdensome for him and his counsel to continue to participate in the case, plaintiff agreed to a severance of its claims against Angelo and the action has been stayed as to him.[2]

The trial was non-jury. Live testimony was taken for ten days. The parties thereafter submitted numerous depositions for review by the Court. The parties also submitted extensive trial and post-trial memoranda, and on October 3, 1986, a hearing was held to permit the parties to supplement their written submissions with oral argument.

## FACTS [3]

### The Formation of the Contract

Wood Products, a family owned and operated company, has its principal place of business in Oakland, Maryland. It is primarily engaged in the business of milling and selling lumber. One of Wood Products' customers was Kingsford Company, a manufacturer of charcoal briquettes, which purchased sawdust from Wood Products for processing into briquettes. Kingsford was interested in obtaining sources of bulk charcoal (as opposed to unprocessed sawdust) for its operations. In January, 1981, Bruce Winter, then employed by Kingsford, arranged a meeting with Wood Products at which a presentation was made regarding the Angelo furnace. The furnace was depicted as being capable of converting sawdust and other wood waste products into charcoal and providing heat from the conversion process for other functions at Wood Products' plant (including drying wood sold for furniture). Present at the meeting were representatives of Kingsford, representatives of Wood Products (including Max Messenger and John Hill) and Frank Angelo.

Early in March two then disconnected, later converging, events occurred. First, Angelo entered into an arrangement for CMI to manufacture Angelo rotary furnaces. Approximately one week later Winter arranged for Messenger and Hill to visit the plant of Jim Humphrey in Brookeville, Pennsylvania, where an Angelo furnace was in operation. Angelo was again present. Also present was Joe Vaughn, a friend of Angelo. Vaughn had worked for Angelo at his family business in Arkansas (where Angelo originated the concept for his furnace), had helped install the Humphrey unit and was presently an employee of CMI. CMI was not mentioned during the meeting but when he returned to CMI's plant in Oklahoma City, Vaughn reported that Wood Products was a potential purchaser of an Angelo furnace.

Later that March Winter arranged for Messenger and Hill to attend the Wood Foresters' Convention in New Orleans. At this convention Messenger and Hill first met Bill DeFriese, the general manager of CMI's Contract Manufacturing division. Vaughn was also present. DeFriese advised Messenger and Hill that CMI had obtained the right to manufacture Angelo furnaces and described the furnace's features, capabilities and benefits. Kingsford representatives were also at the convention and Messenger discussed with them the terms of a possible contract for the sale of charcoal.

As a follow-up to their meeting in New Orleans, on April 7, 1981 DeFriese wrote to Messenger lauding the advantages of an Angelo furnace. The letter stated, inter alia, "in addition to the inherent design of a rotary furnace, there are some additional improvements in a new, improved, Contract Manufacturing manufactured furnace in and above the furnace you saw in operation at Humphrey Charcoal Co. in Brookeville, Pa. There are many enhancements that will be incorporated into the design of the Contract Manufacturing unit as a result of

---

**2.** Prior to trial CMI and Angelo agreed to voluntarily dismiss cross-claims which they had filed against one another.

**3.** Some of the facts as stated are undisputed and others constitute the Court's findings, pursuant to *Fed.R.Civ.P.* 50, from conflicting evidence.

the one year plus operation by Humphrey Charcoal Co." The letter concluded with an invitation for Messenger and another representative of Wood Products to visit Oklahoma City, at CMI's expense, to discuss the benefits of the furnace and to tour CMI's facilities.

Messenger did not respond to DeFriese immediately, and at the end of April De-Friese made arrangements for Messenger and Hill to visit Humphrey Charcoal at CMI's expense for a second demonstration of Humphrey's furnace. DeFriese, Vaughn and Frank Angelo were present at the demonstration. Also in attendance were other potential purchasers of Angelo furnaces. In addition to showing the furnace itself in operation at Humphrey's, De-Friese made a presentation (including a slide show) of CMI's manufacturing capabilities.

In May Messenger and Hill, accepting the invitation in DeFriese's April 7th letter, went to Oklahoma City. They met with DeFriese, Angelo and Vaughn. While walking around CMI's facilities, DeFriese pointed out to Messenger an unusually large rotary drum which had been specially manufactured by CMI nearly two years before and which had (after CMI's customer cancelled the sale) remained in its inventory since. The drum was 10' × 42' in size whereas the Humphrey drum was 8' × 24' and the drum referred to in DeFriese's April 7th letter was 8' × 30'. Messenger mentioned something to the effect that "bigger is better" and DeFriese said nothing to dissuade him from this idea. While the parties discussed the fact that the drum was larger than the one which they had previously been contemplating, DeFriese did not disclose what Angelo told him privately: that he (Angelo) had substantial concerns about whether the larger drum would work. Specifically, Angelo was worried that excessive heat might be generated in a drum so large and that the shell of the particular drum in question might be too thin to hold refractory.[4]

While Messenger and Hill were in Oklahoma City, serious negotiations began concerning Wood Products' purchase of an Angelo furnace. Although Angelo was present during at least some of the discussions, he remained in the background and DeFriese exclusively handled the sales negotiations. Subsequent to the visit, De-Friese prepared a written proposal dated May 11, 1981. The proposal was made to "Angelo Industries" but stated that the furnace was being "prepared especially for Wood Products, Inc." The proposal was forwarded to Messenger by a letter dated May 11, 1981 on the letterhead of Angelo Industries. The letter was in the form of a quotation to Wood Products from Angelo Industries for the furnace. Angelo purportedly signed the letter but the evidence is unclear as to whether he actually did so. It is clear from the evidence that DeFriese had Angelo Industries stationery in his possession throughout the relevant period; that he frequently sent out letters on Angelo's behalf without Angelo's specific direction or authority and that whenever Angelo did sign any documentation, he did so at DeFriese's specific direction.

On June 7, 1981, DeFriese travelled to Wood Products for the purpose of finalizing the sale of the furnace. While there, he agreed to various changes in the terms and conditions of the sales agreement. After final agreement had been reached, De-Friese dictated to a Wood Products' secretary the terms of the purchase order on Wood Products letterhead. This purchase order referred both to CMI's May 11, 1981 proposal to Angelo Industries and Angelo Industries' quotation letter to Wood Products dated the same date. The Court finds that from what DeFriese told him Messenger understood that CMI was a party to

---

4. DeFriese testified that he did not recall whether Angelo had advised him of his concerns. Even if DeFriese had denied the fact, the Court would not have credited his testimony. He was shown by the evidence to be unworthy of belief. While in the employ of CMI, he had (with the knowledge of upper management officials at CMI) become a partner of Angelo, and he lined his pockets as best as he could from this relationship. Apparently, he even stole from CMI itself by taking proceeds from checks paid by CMI to Winter for his services.

the agreement which had been reached.[5] Messenger gave DeFriese a down payment check in the amount of $35,000 made payable to Angelo Industries.

Simultaneously with its negotiations with DeFriese, Wood Products was negotiating with Kingsford concerning the sale of charcoal. In July these negotiations temporarily broke down and, at Wood Products' request, DeFriese returned Wood Products' down payment check. In the covering letter dated July 20, 1981 returning that check, DeFriese instructed Hill to send all future payments to a bank account opened in the name of Angelo Industries at the Liberty National Bank and Trust Company in Oklahoma City. That account was opened by DeFriese and he and Angelo had signature authority over it. On August 6, 1981 Wood Products and Kingsford finalized their contract for the sale of charcoal and on the same day Wood Products wired to the Liberty National account the $35,000 down payment.

DeFriese prepared another purchase order dated August 6, 1981 from CMI to Angelo Industries for the sale of the furnace. This purchase order stated "existing 10' × 42' Drum and skid AS IS." DeFriese initially placed Angelo's initials on the purchase order but he subsequently persuaded Angelo to initial the purchase order himself. This purchase order was never forwarded to Wood Products.

Work on the rotary furnace thereafter proceeded. All of the design and manufacturing work was performed by CMI personnel. Angelo testified (and the Court fully credits his testimony on this point) that he was allowed to play virtually no role in this work. Drawings were prepared by CMI employees and the project was generally overseen by a CMI engineer and by Bruce Winter who by this time had left Kingsford. Winter's salary was paid by CMI. Discussions with Harbison-Walker concerning the refractory were handled by CMI representatives and CMI was the party who entered into the contract for the purchase of the refractory from Chiz Brothers (Harbison-Walker's dealer).

In November 1981 CMI informed Wood Products that the furnace was ready for shipment. DeFriese directed Wood Products to pay the balance due of $365,000 to Porter Hartwell, CMI's credit manager. Wood Products wired the funds to CMI in accordance with this instruction. The furnace was then shipped, and in November 1981 erection and assembly of the unit began at Wood Products' plant. Angelo came to Oakland to assist in the installation and start up of the furnace. Winter also visited the site from time to time to see how matters were progressing. On March 26, 1982, DeFriese travelled to Oakland to pick up a $20,000 check (made payable to Angelo Industries) as final payment on the furnace.[6]

■ Problems developed as soon as the furnace was first fired up. These problems eventually led to Wood Products sending a letter (through its attorney) to CMI dated July 21, 1982 putting CMI on formal notice of the defects in the furnace and Wood Products' resulting damages. As described more fully *infra*, the Court finds that Wood Products acted reasonably in spending several months in trying to make the furnace work and that the failure of the furnace was caused by defects in its design and manufacture for which CMI was responsible. The Court therefore finds that the July 21st letter was sent within a reasonable time after Wood Products discovered the defects and before the condition of the furnace had been substantially changed by anything other than its own defects. *See Md.Code Ann., Commercial Law Art.*, section 2–608.

---

5. The Court also notes its conclusion from observing Angelo during the trial that, based upon Angelo's appearance alone, Messenger would never have entered into the agreement if he had believed that only Angelo was standing behind the furnace.

6. DeFriese apparently had been let go by CMI approximately one week before he made this trip. He did not advise Wood Products of that fact.

### The Defects in the Furnace

The furnace was first started up in early March 1982. Difficulties in operation were immediately experienced and they were never cured. The evidence concerning the furnace's failure was uncontradicted and dramatic. The temperatures were far too hot, seals were burned, fire came out through the resultant openings and flames erupted from the stacks high into the sky causing fires to break out in nearby woods.

Although Robert Block, an expert witness presented by CMI, testified that he believed that the furnace could be made operable by making relatively small repairs at relatively modest cost, the evidence is overwhelming (and the Court finds) that the furnace never has and never will work.[7] There were errors in its fundamental design. As Angelo and Vaughn feared from the outset, the 10' × 42' drum was simply too large. The temperatures within it were excessive and uncontrollable, at least without a temperature control system far more efficient than the one provided. Likewise, as Angelo and Bruce Winter suspected, the shell of the drum was too thin, making it too flexible to hold the refractory. The testimony of Charles Schacht, one of Harbison-Walker's experts whose testimony the Court found to be particularly convincing, made this clear. Since retention of the refractory was critical to the operation of the unit, the furnace was doomed to failure.

▪ CMI was fully responsible for these fundamental defects. While Angelo was the originator of the Angelo rotary furnace concept, it was CMI which designed, engineered and manufactured this particular unit. CMI was also responsible for other ancillary defects which were built into the furnace. While the Court doubts that the furnace could have ever functioned for its intended purpose in light of the inherent problems of drum size and shell thinness, these additional defects contributed to the

furnace's failure. The air supply fan was not able to control the input of air in the lower volume range where it had to be operated. Only one of the several thermocouplers which were installed to gauge temperatures in the various zones of the furnace ever worked satisfactorily. The air distribution tubes sagged and failed. Seals—which were of a lesser quality than had been promised by CMI—burned out. The kiln drive was improperly designed. The rotary valve at the outfeed end should have been designed to include a grate so that pieces of slag and brick could be pulled out to avoid clogging. Moreover, because of all of the various defects, temperatures within the furnace were frequently excessive, and the furnace had to be closed down and re-started on a recurring basis. Thermal damage to the refractory necessarily resulted.

CMI contends that the problems in the operation of the furnace were caused by Wood Products. It argues that the evidence shows that there were fluctuations in the temperatures within the furnace due to inconsistencies in the moisture content of the waste products being fed into the furnace and failures in Wood Products' infeed conveyor system which made the rate of feed inconsistent. CMI also points to the testimony of Angelo that he was dissatisfied with the way that one of Wood Products' employees operated the unit. Doubtless, there were imperfections in Wood Products' operation of the furnace. However, the Court is persuaded by the evidence that Wood Products' own performance was entirely reasonable. It was inevitable that there would be mistakes in operation as Wood Products' personnel learned to use the furnace. It was not these mistakes, however, which caused the failure. Rather, the failure was caused by the fact that Wood Products had been sold a furnace which lacked structural integrity, contained inherent design defects and included

---

**7.** CMI argues that John Kolter, one of Wood Products' experts, agreed that the furnace would be repaired at modest cost. All that Kolter testified was that the cost of identifiable necessary repairs would be relatively small. However, the critical point which he added was that it would be a "longshot" if these repairs made the furnace functional.

component parts which did not work properly.

## DISCUSSION

■ Wood Products' claims against CMI are for negligence in design and manufacture, negligent misrepresentation and breach of warranties, express and implied.[8] Since Wood Products asserts damages only for economic loss, its claim for design and manufacturing negligence must fail. *See Copiers, Typewriters & Calculators, Inc. v. Toshiba Corp.*, 576 F.Supp. 312 (D.Md. 1983). Similarly, although the Maryland courts have indicated that economic losses alone may be recoverable in certain actions for negligent misrepresentation, *see, e.g. Ward Development Co. v. Ingrao*, 63 Md. App. 645, 493 A.2d 421 (1985), they have never ruled upon the question of whether such losses may be recovered for negligent misrepresentation in a products liability setting. A pervasive statutory scheme governs warranty claims in product liability cases, and it appears inappropriate to extend theories of negligent misrepresentation into an area where the Maryland General Assembly has carefully determined who may assert what claims against whom. *Cf. East River Steamship Corp. v. Transamerica Delaval, Inc.*, —— U.S. ——, ——, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865 (1986).

Wood Products' claims for breach of warranty are well founded. CMI challenges these claims on the grounds that (1) it was not in privity with Wood Products, (2) it made no express warranties to Wood Products, (3) in regard to the implied warranty of merchantability, it was not "a merchant with respect to" Angelo rotary furnaces, (4) it had disclaimed all warranties and (5) assuming the existence of warranties which it had made, it did not breach them. This Court's findings that there were substantial defects in the furnace for which CMI was responsible is dispositive of CMI's last contention. Its other challenges likewise are without merit.

---

**8.** Wood Products originally asserted, but later dismissed, a claim for fraud based upon affirmative misrepresentations. At the hearing held on October 3, 1986, the Court raised the question of whether a fraud claim had been proved in connection with DeFriese's failure to disclose to Wood Products that Angelo had specific concerns about use of the 10′ × 42′ drum in the furnace.

Maryland law follows the general rule that the failure to disclose a material fact which the defendant was under a duty to disclose can constitute fraud. *See, e.g., Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 469 A.2d 867 (1984), *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *U.S. cert. denied*, 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985). Of course, CMI was not in the position of being a fiduciary to Wood Products. However, whether or not a duty to disclose exists depends not upon rigidly defined and static classifications but upon the mores of the market place. *See, e.g.*, Restatement (Second) Torts (1979), section 551; Prosser, Torts, section 106 (4th ed.1971). Here, various facts suggest that there was a sufficient "special relationship" between the parties to impose upon CMI the duty to disclose Angelo's concerns. The information not disclosed went to the heart of the transaction. The information was not equally available to both parties but exclusively within the ken of CMI. CMI knew that it was in exclusive possession of the information. By virtue of its active solicitation of Wood Products' business, CMI had created the situation of which it was now taking unfair advantage, and as CMI knew, Wood Products was making a substantial investment in the furnace.

Further, it is clear that Wood Products had no reason to suspect that Angelo had specific concerns about use of the larger drum. It was evident by the time that Messenger and Hill were touring the plant in Oklahoma City that they were ready to enter into serious negotiations with CMI for the purchase of the smaller sized furnace which had previously been discussed. Certainly, they could have expected that if CMI had knowledge that the use of the larger drum in CMI's inventory was substantially more risky than use of a newly manufactured smaller drum (with a thicker shell), CMI would have disclosed it. Businessmen are properly on notice that people with whom they are dealing are attempting to further their own reasonable commercial interests. However, the law does not require that they assume that everyone is driven by quintessential greed. *Cf. Md.Code Ann., Commercial Law Article*, sections 1-201(19); 1-203.

Although the Court has the power to amend the pleadings to conform to the evidence, it will not do so here for two reasons. First, the parties have not had the opportunity to address the theory of fraud which the Court has raised sua sponte. Second, justice does not require the amendment since Wood Products' warranty claims provide a sufficient basis to compensate it for the damages which it has suffered from CMI's wrongful conduct.

## Privity

Privity is not required in any action for breach of an implied warranty of merchantability. *Md.Code Ann., Commercial Law Article*, section 2–314. Privity is, however, required in an action for breach of express warranty or an implied warranty of fitness for a particular purpose in which only economic loss is claimed. *See, e.g., Copiers, Typewriters, Calculators, Inc. v. Toshiba Corp., supra; Md.Code Ann., Commercial Law Article*, section 2–318.

 Here, while the contract documents are not entirely clear, the evidence taken as a whole demonstrates that there was privity between Wood Products and CMI. The documents' lack of clarity is due in large measure to the fact that DeFriese of CMI maneuvered himself into a position where he was writing all of them. He prepared not only proposals from CMI to Angelo and from Angelo to Wood Products but also the purchase order from Wood Products which finalized the agreement between the parties. He tried to make it appear that Angelo stood contractually between Wood Products and CMI in the sales chain. However, he did not succeed. The Wood Products' purchase order which he dictated referred both to the CMI proposal to Angelo and the Angelo proposal to Wood Products. If, as CMI contends, it was understood by the parties that Wood Products was purchasing the furnace only from Angelo, the reference in its purchase order to the CMI proposal is inexplicable. It was there because DeFriese led Messenger to believe, and because Messenger in fact understood, that CMI and Angelo were both assuming obligations to Wood Products under the agreement.[9]

The evidence clearly demonstrates that this was so. From their first meeting at the convention in New Orleans to the slide presentation in Brookeville, Pennsylvania, to the tour of the CMI plant in Oklahoma City, DeFriese had been selling Messenger on CMI's capability to produce an Angelo furnace. In his April 7, 1981 letter describing the advantages of the furnace, he referred to "the Contract Manufacturing unit." While Angelo was from time to time present during meetings with Messenger, he remained in the background and it was DeFriese who handled the negotiations with Messenger exclusively. It also was DeFriese who came to Oakland, Maryland in June 1981 to finalize the deal, and it was DeFriese who agreed to modifications in the terms and conditions of the transaction at the very time that he was preparing the Wood Products purchase order.

The subsequent history of payment under the agreement confirms that CMI was a party to the transaction. Three payments were made. While the first and third were made by wire transfer and check, respectively, payable to Angelo Industries, they were each either made pursuant to DeFriese's instruction or picked up by him directly. The middle payment— by far the largest (for $365,000)—was wire transferred to CMI's credit manager at DeFriese's instruction.

Moreover, even assuming that Wood Products and CMI were not in privity, the Court finds that CMI nevertheless would be liable on the warranty claims.

First, it is unquestionable that CMI played a significant role in the sale of the furnace. It actively solicited Wood Products' business and dominated the negotiations. It can thus be held to the obligations of a seller under the Commercial Code. *See Sanco, Inc. v. Ford Motor Co.*, 579 F.Supp. 893, 899 (S.D.Ind.1984).

Second, CMI is estopped to deny that it was in privity with Wood Products. In *Addressograph-Multigraph, Corp. v. Zink*, 273 Md. 277, 329 A.2d 28 (1974), the Maryland Court of Appeals held that a manufacturer was estopped from asserting lack of

---

9. CMI contends that upper management officials at CMI told DeFriese to make sure that CMI contracted only with Angelo and not with any third parties. Even if that is assumed to be true, CMI does not (as it could not) deny that

DeFriese had ample apparent authority to enter into contracts on behalf of CMI. Moreover, CMI had created the situation which DeFriese exploited by authorizing him to become a partner of Angelo. *See* footnote 4, *supra*.

privity where it had performed obligations under an equipment warranty and led the buyer of the equipment to believe that it stood behind the warranty. Although *Addressograph* is distinguishable from the instant case in that it involved post-contractual rather than pre-contractual conduct, the facts here even more strongly compel the finding of an estoppel. CMI's conduct was unconscionable. It tricked Wood Products into believing that Wood Products was entering into a contract with CMI and then created documents attempting to insert Angelo as a straw party. Further, perceiving an opportunity to unload the 10′ by 42′ drum for which it had not other use, it led Wood Products into making a substantial capital investment while knowing that Angelo had serious concerns (subsequently proven to be entirely justified) about whether the large drum would work in the charcoal conversion process. Messenger can, of course, be faulted for not making sure that the contract documents were drafted more tightly. However, the documents were at least ambiguous and, while perhaps clear to a lawyer (or a rogue) in their intended effect, they were misleading to a businessman like Messenger who was accustomed to dealing in good faith. The doctrine of estoppel was created precisely for such a situation. Equity will not allow Messenger's naivete to be punished and CMI's artifice to be rewarded.

*Express Warranties*

Wood Products alleges three categories of express warranties made by CMI: representations concerning the advantages of "the Contract Manufacturing unit" made in DeFriese's April 7, 1981 letter; oral representations made concerning the ratio between the infeed of sawdust and the output of charcoal; and specific representations made in CMI's May 11th proposal which became part of the written agreement between the parties.

■ Wood Products' first two claims lack merit. The furnace referred to in the April 7th letter was the smaller 8′ × 30′ unit. Thus, while that letter is relevant as evidencing that DeFriese was leading Messenger to believe that he was dealing directly with CMI, its statements concerning the beneficial features of a CMI-manufactured rotary furnace cannot be fairly carried over into the agreement for a larger unit which was ultimately reached. The claim based upon representations concerning the infeed/output ratio fails because the evidence shows that the statements concerning that ratio were—at least for the most part—made not by DeFriese or other CMI personnel but by Winter (when he was not in the employ of CMI), Angelo and Humphrey. Furthermore, CMI's May 11th proposal specifically disclaimed any warranty for a specific level of output.

■ The representations made in CMI's May 11th proposal do, however, form the basis for an express warranty claim. Numerous promises made by CMI in that proposal were not fulfilled. Among these were the following: The air distribution pipes failed. The furnace never had three discrete temperature zones. The secondary combustion chamber did not work effectively and indeed once was the situs of an explosion. The fans were not able to control temperatures properly. Seals were of a lesser quality than warranted. The electrical control system never was able to provide for semi-automatic control of the system. All but one of the temperature indicators failed, and as a result, the chart recorders were never able to provide continuous monitoring of the operation. Individually, each of these breaches was significant; in the aggregate they provided a wholly sufficient basis for Wood Products' revocation of acceptance.

*CMI as a "Merchant with respect to goods of the kind"*

■ Pointing to the experimental nature of the furnace, CMI argues that it was not "a merchant with respect to goods of the kind" and that it therefore provided no implied warranty of merchantability. *See Md. Code Ann., Commercial Law Article,* section 2–314. In fact, CMI was then manufacturing (for the use of one of its affiliates) a similar furnace and it has manufac-

tured another since. More fundamentally, most, if not all, of the defects in the furnace were due to fundamental design, engineering and manufacturing errors which were well within CMI's area of experience and expertise. From the outset of the parties' relationship, DeFriese was vaunting—orally and graphically—CMI's engineering and manufacturing capabilities. The evidence is clear that both in dedication of resources and in result CMI failed to utilize these capabilities properly and, in failing to do so, it breached the implied warranty of merchantability which attached to the transaction.[10]

### Disclaimer

CMI contends that it disclaimed any implied warranty of merchantability by including in the purchase order which it issued to Angelo the words "AS IS" after the description of the 10' × 42' drum. This purchase order was not provided to CMI to Wood Products until after this litigation began. In an orthodox tri-partite sales transaction involving a manufacturer, vendor and purchaser, that fact would not be dispositive. A manufacturer who wishes to exclude warranties (to the extent permitted by the commercial law) can do so only by placing disclaiming language in the contract documents with his immediate buyer; it is commercially unreasonable to expect him to notify each ultimate purchaser (whose very identity is frequently unknown to him) of his disclaimers.

■ This is not, however, such an orthodox case. Here, through the course of dealings, CMI placed itself in privity with Wood Products. In light of this fact, it was incumbent upon CMI to bring to Wood Products' attention any alleged disclaimer upon which it was relying. *See, e.g., Fairchild v. Maritime Air Service,* 274 Md. 181, 333 A.2d 313 (1975). In any event, the

language upon which CMI relies is insufficient to disclaim an implied warranty of merchantability for the furnace as a whole. The words "AS IS" appear directly after the description of the drum. So placed, all that this phrase disclaimed was any warranty for the physical condition of the drum which had been sitting in CMI's inventory for a considerable period of time. It did not disclaim any warranty for the design and manufacturing defect of incorporating the drum into the furnace or for any of the other numerous defects in the furnace.

### CMI's Third Party Claims Against Harbison-Walker

CMI asserts claims for contribution and indemnity against Harbison-Walker on the ground that improper refractory caused the furnace to fail. As indicated in the Statement of Facts, *supra,* the Court finds that the opposite is true, i.e. that defects in the design and manufacture of the furnace caused damage to the refractory. This finding is conclusive as to the third party claim. However, a brief discussion of several of CMI's contentions may be of assistance in completing the record.

■ First, the Court finds that although CMI's expert witness, Robert Block, is well-qualified as a metallurgist, the testimony which he gave concerning the refractory is not entitled to any weight. The factors which the Court has taken into account in making this finding are (1) Dr. Block has had no prior experience in the refractory industry and was therefore unqualified to express any opinions concerning practice, custom and usage in the industry; (2) his testimony that Harbison-Walker should have recommended castiple rather than brick as the refractory throughout the furnace was entirely unsupported by other evidence and was simply

---

10. It should also be noted that the question of whether CMI was a merchant of goods of the kind is somewhat academic. The evidence is clear, indeed uncontradicted, that CMI was fully aware of the purpose for which Wood Products was purchasing the furnace. Thus, this is a case in which the implied warranty of merchantabili-

ty and the implied warranty of fitness for a particular purpose overlap. *See Myers v. Montgomery Ward & Co.,* 253 Md. 282, 252 A.2d 855 (1969). Section 2–315, which establishes liability for a breach of warranty for a particular purpose, contains no requirement that the seller be a merchant with respect to goods of the kind.

wrong; and (3) his testimony was in critical respects based upon false factual premises. For example, he believed that substantial spalling of the refractory had occurred only at the infeed end when, in fact, the testimony of those with personal knowledge (particularly Hill) established that spalling had occurred throughout the furnace. Likewise, he believed that Mark Schneckenberger, the Harbison-Walker representative who was involved in the refractory selection process, had taken into account only temperature conditions when making recommendations concerning the refractory. In fact, Schneckenberger had—before making his recommendations—conducted an entirely reasonably investigation into the nature of the use to which the furnace would be put.

Second, the Court finds that Harbison-Walker's recommendation of Alamo S block was entirely proper. The testimony of James Uhrig of Harbison-Walker to which CMI points to establish the contrary simply does not establish that which CMI contends and the remaining evidence in the record overwhelmingly establishes the suitability of the Alamo S brick.

Finally, the Court finds that Harbison-Walker fully met its responsibility in connection with the question of the adequacy of the shell to hold the refractory. The evidence establishes that Winter, then working for CMI, pointed out to Schneckenberger the drum which was to be used in the furnace and asked him if it would be sufficient to hold the refractory. Schneckenberger answered that it was beyond the area of his expertise to make such an engineering judgment and he specifically mentioned three companies which designed rotary kilns to whom Winter should direct his inquiry. Far from establishing that Schneckenberger acted improperly, this evidence dramatically demonstrates that CMI, having a concern about the adequacy of the shell, was entirely irresponsible in going forward without advising Wood Products of its concern or following up with the kiln manufacturers to whom Schneckenberger referred it.

*Damages*

██ The sole remaining issue to be considered is that of plaintiff's damages. The law is clear that a plaintiff may recover not only the price which he paid for non-conforming goods but also any and all incidental or consequential damages reasonably foreseeable from defendant's breach. *See, e.g., Md.Code Ann., Commercial Law Art.,* Sections 2–608; 2–711; 2–713; & 2–715; *Certain-Teed Products Corp. v. Goslee Roofing & Sheet Metal, Inc.,* 26 Md.App. 452, 339 A.2d 302 (1975); *Fairchild Stratos Corp. v. Siegler Corp.,* 225 F.Supp. 135, 147–48 (D.Md.1963). Here, Wood Products produced complete and detailed evidence of its damages. The Court finds that the damages listed by Wood Products on its "Summary of Damages" exhibit, subject to two additional deductions not included in that summary, were proved with reasonable certainty and were direct and reasonably foreseeable consequences of CMI's wrongful conduct: The damages to be awarded are as follows:

SUMMARY OF DAMAGES (as stated by Wood Products)

| | | |
|---|---|---|
| 1. | Original IRB (after adjustments) | $ 648,356.64 |
| 2. | Additional Expenses (Pages 1–9) (after adjustments) | 124,865.28 |
| 3. | Sawdust purchases | 13,579.83 |
| 4. | Interest paid to date | 246,847.80 |
| 5. | Life Insurance | 10,648.70 |
| 6. | Total Labor | 99,185.53 |
| | SUBTOTAL (Items 1–6) | $1,143,483.78 |

Estimated Future Expenses:

| | | | |
|---|---|---|---|
| 7. | Moving of Boiler and Replacing Same | $ 5,500.00 | |
| 8. | Repair of Building | 3,600.00 | |
| 9. | Taking Down Silo | 4,000.00 | |
| | SUBTOTAL (Items 7–9) | $ 13,100.00 | |
| | TOTAL (Items 1–9) | | $1,156,583.78 |

**DEDUCTIONS**

| | | | |
|---|---|---|---|
| 1. | Charcoal from furnace sold to Humphrey Charcoal | $ 19,108.63 | |
| 2. | Working capital drawn on IRB requisition (duplicate claim since otherwise awarded under "additional expenses" and "labor costs") | 37,986.16 | |
| | TOTAL DEDUCTIONS | | $ 57,094.79 |
| **NET DAMAGES** | | | **$1,099,488.99** |

CMI argues that certain items of damage should be reduced because Wood Products did not produce invoices to support them. The production of invoices is an acceptable—but not a necessary—method of proving damages, and the Court is satisfied that here Wood Products has proved its damages with reasonable certainty.

CMI further contends that any damage award should be reduced by the amount of deductions for depreciation and by the amount of investment tax credits which Wood Products took on its income tax returns. The Court does not agree. It may be that the payment of the judgment rendered in this case will require Wood Products to file amended tax returns. However, the depreciation and investment tax credit amounts are not germane to the calculation of damages to be paid by CMI.

■ The two remaining items to consider are Wood Product's claim for lost profits and its claim for prejudgment interest. The claim for lost profits is denied. The calculations for that claim are dependent upon the output of the furnace remaining at a constant level, and CMI specifically disclaimed any warranty for level of output in its May 11, 1981 proposal. Furthermore, although Wood Products' lost profit calculations are based upon an existing contract with Kingsford and thus do not share all of the uncertainties of other new ventures, the fact that there is absolutely no estab-lished record of performance for the furnace necessarily renders the economic testimony upon which Wood Products relies substantially speculative.

■ The award for prejudgment interest will, on the other hand, be allowed. The law is clear that in cases such as this the Court has discretion as to whether or not to award such interest. *See, e.g., Robert C. Herd & Co. v. Krawill Machinery Corp.*, 256 F.2d 946 (4th Cir.1958); *Peerless Ins. Co. v. Board of Commissioners*, 248 Md. 439, 442, 237 A.2d 15 (1968); *Fairchild Stratos Corp. v. Siegler Corp.*, 225 F.Supp. 135 (D.Md.1963). Wood Products' losses are liquidated and clearly defined. To deny Wood Products prejudgment interest for those losses would be to deprive it of a substantial part of the compensation to which it is entitled and, at the same time, to reward CMI for its intransigence.

Plaintiff is requested to submit a proposed form of judgment order including a provision for prejudgment interest.