634 A.2d 1330

**A.J. DECOSTER CO. et al.**

v.

**WESTINGHOUSE ELECTRIC CORPORATION.**

**No. 46, Sept. Term, 1993.**

Court of Appeals of Maryland.

Jan. 7, 1994.

246

Timothy G. Smith (Donovan, O'Connell & Broderick), all on brief, Silver Spring, for appellant.

John A. Singer (Weinberg and Green), on brief, Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE *, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

This case involves the distinction between property loss and pure economic loss in determining whether a claim may be brought under a tort or contract theory, or both. It also involves the question whether, in Maryland, a plaintiff may recover in tort under a strict liability theory for property loss resulting from an allegedly defective product manufactured by the defendant, when no death or personal injury, or significant risk thereof, resulted from the defect.

## I

Appellant A.J. Decoster Company (Decoster), a commercial chicken and egg producer, suffered the loss of more than 140,000 chickens on July 20, 1989, when a power failure interrupted the power supply to the ventilation system in Decoster's chicken houses, and the chickens were suffocated. The power failure occurred when Choptank Electric Utilities, Inc., the supplier of three-phase electrical power to Decoster, experienced a loss of phase "A" power because of thunderstorms in the area. Decoster's emergency backup power system, powered by a diesel generator, did not activate, allegedly as a result of a defective transfer switch manufactured by Westinghouse Electric Corporation (Westinghouse). The ventilation system relied upon the Westinghouse transfer switch to transfer from line power, supplied by Choptank, to the generator-powered backup system. The switch was designed to detect and respond to the loss of any phase of power. When the transfer switch did not sense the loss of phase "A" power and activate the backup power system, the ventilation

---

* McAULIFFE, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

fans, operating on reduced voltage, overheated and shut down. Decoster claimed losses of more than $100,000 from the death of the chickens, whose primary purpose was egg production.

Decoster filed suit against Westinghouse on October 21, 1991 in the Circuit Court for Kent County, alleging counts of negligence, strict liability, breach of express warranty, and breach of implied warranties of merchantability and fitness for a particular purpose. In its complaint, Decoster alleged that it purchased the switch from Westinghouse [1]; that Westinghouse released the switch in a defective condition; that the defective condition rendered it unreasonably dangerous; that the defective condition caused the injury complained of; and that the switch was expected to reach and in fact did reach Decoster without substantial change in its condition.

On November 27, 1991 Westinghouse filed a motion to dismiss or, in the alternative, for summary judgment. In support of its summary judgment motion, Westinghouse submitted the affidavit of James W. McGill, then a product line manager for Westinghouse, stating that the transfer switch at issue was manufactured and sold in 1979 to an electrical supply dealer, Gilman Electric, of Auburn, Me.

With its complaint, Decoster served Westinghouse with interrogatories. Subsequently, in a telephone conversation on November 26, 1991, confirmed by letter from Westinghouse dated November 27, 1991, Decoster agreed to a stay of discovery until fifteen days after any order by the Circuit Court denying Westinghouse's motion to dismiss.

By order dated December 1, 1992, the court (Price, J.) dismissed the negligence and strict liability counts without leave to amend, and granted summary judgment in favor of Westinghouse for the breach of warranty counts. The court's dismissal of the negligence and strict liability counts was based on a determination that all damages allegedly suffered by Decoster were economic losses not recoverable in tort.

---

1. Decoster later conceded that it purchased the switch from an entity which purchased it from Westinghouse.

The court's grant of summary judgment on the warranty claims was based on a finding that limitations had run, because Westinghouse had tendered delivery of the switch in 1979, and the statute of limitations for warranties under Maryland Code (1975, 1992 Repl.Vol.) § 2–725 of the Commercial Law Article, expired four years after the cause of action accrued, accrual occurring at the date of tender of delivery. Decoster appealed to the Court of Special Appeals on December 21, 1992. We granted certiorari prior to review by the intermediate appellate court to consider the important issue raised in this appeal, 331 Md. 178, 626 A.2d 967.

## II

### The Tort Claims

In determining whether the trial court erred in granting the motion to dismiss for failure to state a claim pursuant to Md.Rule 2–322(b), we must assume the truth of all well-pleaded relevant and material facts as well as all inferences that reasonably can be drawn therefrom. Dismissal is proper only if the facts alleged fail to state a cause of action. *Faya v. Almaraz,* 329 Md. 435, 443, 620 A.2d 327 (1993); *Sharrow v. State Farm Mutual,* 306 Md. 754, 768, 511 A.2d 492 (1986).

Decoster argues that it adequately stated a cause of action in tort because the death of the chickens was not an economic loss, but a property loss properly recoverable through a tort action. Decoster further argues that the court erred in failing to apply the strict liability principles of § 402A of the Restatement (Second) of Torts. It asserts that Maryland has adopted strict liability in tort as a cause of action in accordance with § 402A's provisions and therefore Westinghouse is subject to liability for harm caused by its defective product to Decoster's property, i.e., the 140,000 suffocated chickens.

### A

### The Negligence Count

Losses related to product liability claims may be categorized generally as (1) personal injuries, (2) physical harm to tangible

things, and (3) intangible economic loss resulting from the inferior quality or unfitness of the product to serve adequately the purpose for which it was purchased. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 101, at 707–08 (5th ed. 1984). Historically, a purchaser suffering only economic loss has ordinarily been unable to bring a tort action for negligence or in strict liability; such purchasers have been limited to contract actions for breach of a warranty or, in the case of fraud, a tort action for deceit. *Id.* at 708. However, purchasers claiming physical injury or harm to tangible things generally may recover under negligence or strict liability in tort and breach of warranty theories.[2] *Id.*

Economic losses include such things as the loss of value or use of the product itself, the cost to repair or replace the product, or the lost profits resulting from the loss of use of the product. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 101 at 665 (4th ed. 1971). *See also* Comment, *Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages—Tort or Contract?*, 114 U.Pa. L.Rev. 539 (1966).

The distinction between tort recovery for physical injury and warranty recovery for economic loss derives from policy considerations which allocate the risks related to a defective product between the seller and the purchaser. A manufacturer may be held liable for physical injuries, including harm to property, caused by defects in its products because it is charged with the responsibility to ensure that its products

---

**2.** Courts have distinguished between property damage to the defective product itself and damage to other property. In commercial cases, most courts have refused to allow tort recovery for damage to the product itself, considering such damage solely economic loss. *Prosser and Keaton, supra,* at 709 n. 14.5. Some courts have allowed plaintiffs to recover for damage to a dangerously defective product, along with other damages, under a strict liability theory, when the injury resulted from an accident. *Id.* at 708–09. Some courts have allowed tort recovery for damage to the defective product itself where there was no danger or accident, but also have allowed disclaimers of liability for damage to the defective product when the disclaimer is negotiated and unambiguous. *Id.*

meet a standard of safety creating no unreasonable risk of harm. However, where the loss is purely economic, the manufacturer cannot be charged with the responsibility of ensuring that the product meet the particular expectations of the consumer unless it is aware of those expectations and has agreed that the product will meet them. Thus, generally, the only recovery for a purely economic loss would be under a contract theory. *See* Keeton, et al., *supra*, § 101 at 708 (5th ed. 1984). *See also* Note, *Economic Loss In Products Liability Jurisprudence*, 66 Colum.L.Rev. 917 (1966).

We have held that there is no recovery under a negligence theory for purely economic losses, unless the defect causes a dangerous condition creating a risk of death or personal injury. *Council of Co-owners v. Whiting Turner*, 308 Md. 18, 517 A.2d 336 (1986), involved an action by a condominium owners' association against the general contractor, developer and architects of their building, for negligent construction of the building. We there acknowledged the general principle that tort liability is limited to situations in which the negligence causes physical harm to person or property, but concluded that the determination of whether a duty should be imposed should depend upon the risk generated by the negligent conduct rather than the nature of the resultant damage. We noted the increasing number of courts that have declined to distinguish between a risk of injury to person or property and a risk of economic loss. Accordingly, we allowed recovery in tort to correct construction defects because we found that the defects created a serious risk of injury to residents of the building. *Id.* at 33–35, 517 A.2d 336.

Under *Whiting Turner*, Decoster's ability to pursue an action in tort against Westinghouse for the loss of its chickens turns upon whether its damages are considered physical harm or economic losses and, if the latter, whether the defective switch caused a dangerous condition creating a risk of death or personal injury to humans. We need not reach the second part of this determination, because the death of the chickens is a loss of physical property, rather than an economic loss.

Decoster does not seek to recover for the loss of value of the switch, or its replacement or repair costs. Nor does it seek recovery of lost profits from its diminished egg production. These are all economic losses. Instead, Decoster seeks only the replacement of property that was damaged by the alleged defectiveness of the product manufactured by Westinghouse.

In support of its position that the losses suffered in the present case are solely economic in nature, Westinghouse relies upon *Copiers Typewriters Calculators v. Toshiba Corp.,* 576 F.Supp. 312 (D.Md.1983), in which a purchaser of photo-copying machines sought recovery for losses resulting from defects in the copiers. In that case, the court, applying Maryland law, declined to extend a manufacturer's duty to encompass liability for economic injury and dismissed the plaintiff's tort claims because the complaint alleged no proper-ty damage. *Id.* at 326. In *Copiers,* however, the plaintiff sought recovery for the failure of the defective copiers to perform adequately, not for damage to other property result-ing from the copiers' defects. *Id.* Similarly, in *Wood Prod-ucts, Inc. v. CMI Corp.,* 651 F.Supp. 641 (D.Md.1986), the court dismissed Wood Products' negligence claims because damages alleged were solely economic in nature, acknowl-edging that the plaintiffs alleged no damage to property other than the defectively designed furnace. *Id.* at 648. While plaintiff's damages included such future expenses as removal of a boiler, taking down of a silo and repair of a building, these appeared to be expenses associated with the removal and replacement of the defective furnace. *Id.* at 652–53.

Westinghouse also relies upon *Winchester v. Lester's of Minnesota, Inc.,* 983 F.2d 992 (10th Cir.1993), a case involving damage to livestock, in support of its position that Decoster has suffered solely economic damages. *Winchester* involved an action by hog farmers against the builder of a hog house to recover for damages allegedly resulting from defects in the hog house's ventilation system. The court found that the breach of warranty claims asserted by the farmers sounded in contract rather than tort. Damages included extra labor, lost hogs, losses due to the sale of underweight hogs, extra veteri-

nary bills, lost profits and costs expended to correct the ventilation system. The court stated that "although plaintiffs' loss of hogs due to poor ventilation is property damage of a sort, the essence of their claim is the loss of the benefit of a properly ventilated hog house, plus consequential damages." *Id.* at 996.

We do not find the reasoning in *Winchester* to be persuasive in the present case, where the entirety of the plaintiff's claim is the loss of the chickens and thus solely a claim for loss of property. *Copiers* and *Wood Products, supra,* are equally distinguishable because, here, Decoster's damage claims include only the physical injury to property wholly distinct from the allegedly defective product, rather than the costs associated with replacing or repairing the product.

A more persuasive case is *Yasuda Fire & Marine Ins. v. Lake Shore Elec.,* 744 F.Supp. 864 (S.D.Ind.1990), involving a fact pattern virtually identical to the present case. There, the plaintiff filed a subrogation action to recover sums paid to its insured for losses occurring when a switch malfunctioned and caused a loss of power to ventilation fans in a poultry house, resulting in the suffocation of numerous chickens. The court rejected the defendants' contention that the loss of the chickens was an economic rather than a property loss and thus non-recoverable. *Id.* at 870–71. There was no dispute in *Yasuda* that the chickens constituted "property"; rather, the dispute was over the construction of a provision of an Indiana statute which allowed recovery for physical harm to a consumer or his property. The statute defined physical harm to property as "sudden major damage" and excluded from recovery any "gradually evolving" damage to property or economic losses from such damage. The question was not whether the chickens constituted property but whether "such damage" referred only to "gradually evolving" damage or "sudden major" damage, as well. The court reasoned that if all economic loss from any property damage were disallowed, then, for practical purposes, recovery for property damage would be negated. *Id.* at 871–72. Having no such limiting language to construe,

we need only conclude, in agreement with the court in *Yasuda*, that there is no question that chickens are property.

Thus, consistent with our decision in *Whiting Turner*, we hold that the trial judge erred in dismissing the negligence count of Decoster's complaint because the damages alleged were property damages rather than purely economic in nature.

## B

### Strict Liability Count

■ With regard to Decoster's strict liability count, we have not heretofore applied the doctrine of strict liability to a case involving injury to property alone. However, we have applied the doctrine in a case involving personal injury caused by a defective product. In *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976), a man was injured when a car he was driving accelerated suddenly and crashed into a tree, allegedly as a result of a defective accelerator mechanism. In *Phipps*, in an opinion for the Court by Judge Eldridge, we adopted the theory of strict liability set forth in the Restatement (Second) of Torts § 402A (1965):

"Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer or his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

See *Phipps, supra,* at 353, 363 A.2d 955.

Decoster argues that the trial court erred in dismissing its strict liability claim, asserting that this Court, in *Phipps,* adopted § 402A in its entirety and therefore property damages such as Decoster's are recoverable in Maryland under a strict liability theory. Westinghouse avers that in a commercial situation such as the instant case, Decoster's remedies must be limited to breach of warranty claims. It argues that the legislature, through its enactment of the Uniform Commercial Code with its breach of warranty remedies, created a comprehensive scheme for the recovery of economic losses in commercial situations. Because we have determined that the losses in the present case are property damage rather than economic losses, we need not further discuss the issue of when economic losses may be recoverable. However, in response to Westinghouse's contention that the legislature has provided the sole remedies for commercial property losses,[3] we will reiterate our response to the same contention by the manufacturer in *Phipps.* We will also briefly review the development of strict liability principles in the context of commercial property losses.

In *Phipps,* the automobile manufacturer argued that we should not adopt the theory of strict liability in tort because the warranty provisions of the Maryland Uniform Commercial Code adequately protected the interests of consumers and sellers. The manufacturer further contended that the legislature, in enacting the warranty provisions of the U.C.C., had preempted the field of products liability law and that the adoption of strict liability would alter substantially the tradi-

---

3. Although it appears that Westinghouse was referring only to remedies for economic losses in its contention that warranty actions alone are appropriate, it is also apparent that Westinghouse has defined economic losses so broadly as to encompass all losses suffered by a commercial enterprise, with the sole exception of personal injury or death.

tional rights of consumers and sellers. *Id.* at 348–49, 363 A.2d 955. We rejected the preemption contention, noting an "absence of any expression of intent by the legislature to limit the remedies available to those injured by defective goods." *Id.* at 350, 363 A.2d 955. We acknowledged in *Phipps* that the requirement of privity, formerly an obstacle to recovery under a contract action, had been eliminated by the legislature in actions for breach of warranty resulting in personal injury. But we recognized that there were other limitations imposed by contract law which did not exist under tort law. We noted the possibility of waiver of warranty liability by a manufacturer's use of a disclaimer. We also recognized the existence of notice requirements for breach of warranty actions by buyers. And we observed that different limitations periods are in effect for tort and contract actions. *Id.* at 349, 363 A.2d 955. We said:

"[T]here is no reason why a party injured by a defective and unreasonably dangerous product, which when placed on the market is impliedly represented as safe, should bear the loss of that injury when the seller of that product is in a better position to take precautions and protect against the defect. Yet this may be the result where injured parties are forced to comply with the proof requirements of negligence actions or are confronted with the procedural requirements and limitations of warranty actions."

*Id.* at 352–53, 363 A.2d 955.

Prior to the emergence of the theory of strict liability in tort, the principal source of strict liability was the law of warranty. *See* 5 F. Harper, F. James and O. Gray, *The Law of Torts* § 28.15 at 444 (2d ed. 1986). *See also* Comment b to § 402A of the Restatement. The law of warranty developed primarily to protect purchasers from commercial losses caused by the failure of the product to serve their needs. Its shape and form were dictated by commercial rather than safety concerns and its application was extended collaterally to accidental injuries. Harper, James and Gray, *supra,* at 444–45; Keeton, et al., *supra,* § 95A at 679–80. Warranties attached to certain sales developed first in the common law. Later,

these concepts were codified, first in the provisions of the Uniform Sales Act, and later in its successor, the Uniform Commercial Code. However, both the Sales Act and the U.C.C. contained limitations which made it more difficult for buyers to recover, such as notice requirements and disclaimer provisions. It became apparent that strict liability based on warranty was not adequate to protect consumers and to further the policy that the costs arising from defective products should be borne by those who make and sell them. Keeton, et al., *supra*, § 98 at 692.

Beginning with several landmark judicial decisions, *see, e.g., Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963) (the pioneer decision announcing strict tort liability without dependence on warranty), followed by the adoption of § 402A in 1964 by the American Law Institute, the strict liability warranty remedy evolved into the theory of strict liability in tort. Nearly every state has adopted some version of § 402A. Harper, James and Gray, *supra*, at 445 n. 7; Keeton, et al., *supra*, § 98 at 694. The Uniform Commercial Code, with its provisions concerning express and implied warranties, which both create and limit liability, also has been widely adopted. However, in situations involving physical injury or property damage resulting from a breach of warranty, most courts have chosen not to limit plaintiffs' causes of action to actions under the statute, which sets forth the above-mentioned limiting conditions and restrictions. Harper, James and Gray, *supra*, at 450–51. Where a plaintiff seeks damages for a loss of bargain, rather than personal or property injury, many courts have refused to extend the tort remedy. *Id.* at 452 n. 25 (and cases cited therein). But where products are dangerous, courts have found that social interests transcend business expectations. *Id.* at 454. Thus, the strict liability remedy is based on public policy that the burden of accidental injuries caused by products should fall on the seller and be considered a cost of production for which liability insurance can be purchased. *See* Comment c to § 402A; Keeton, et al., *supra*, § 98.

It is beyond question that § 402A applies not only to accidental injuries to consumers or users of a product, but also to injury to the property of the user or consumer. Section 402A(1) sets forth the applicable seller as "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer *or to his property*" and further provides that such seller is subject to liability for "physical harm thereby caused to the ultimate user or consumer *or his property* ..." (emphasis added).

Numerous courts, in denying tort recovery based on strict liability for intangible economic loss, have stated that recovery would be available if the loss involved property damage or personal injury. In the classic case denying tort recovery for economic loss, *Seely v. White Motor Company,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), the court agreed with the plaintiff's contention that the doctrine of strict liability should be extended to govern physical injury to property, stating that "[p]hysical injury to property is so akin to personal injury that there is no reason for distinguishing them. *Id.* 45 Cal.Rptr. at 24, 403 P.2d at 152. However, in *Seely* the court found no proof that property damage to the plaintiff's truck was caused by a manufacturing defect. *Id.* In *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), the court, in holding that economic losses were not recoverable under a strict liability theory, held nevertheless that "when a product is sold in a defective condition that is unreasonably dangerous to the user or consumer or to his property, strict liability in tort is applicable to physical injury to the plaintiff's property, as well as to personal injury." *Id.* 61 Ill.Dec. at 751, 435 N.E.2d at 448. *Accord Consumers Power Co. v. Curtiss–Wright Corp.,* 780 F.2d 1093 (3d Cir. 1986); *Miller Industries v. Caterpillar Tractor Co.,* 733 F.2d 813 (11th Cir.1984); *Town of Hooksett School Dist. v. W.R. Grace Co.,* 617 F.Supp. 126 (D.N.H.1984); *Purvis v. Consolidated Energy Products Co.,* 674 F.2d 217 (4th Cir.1982); *Tourist Village Motel, Inc. v. Massachusetts Engineering Co., Inc.,* 801 F.Supp. 903 (D.N.H.1992); *Mississippi Power & Light v. Branson Aircraft,* 797 F.Supp. 871 (D.Colo.1992);

*Airport Rent–A–Car, Inc. v. Prevost Car, Inc.,* 788 F.Supp. 1203 (S.D.Fla.1992); *Connecticut General Life v. Grodsky Service,* 781 F.Supp. 897 (D.Conn.1991); *T.H.S. Northstar Assoc. v. W.R. Grace & Co.,* 767 F.Supp. 969 (D.Minn.1991); *Frank M. Booth, Inc. v. Reynolds Metals Co.,* 754 F.Supp. 1441 (E.D.Cal.1991); *Eastern Refractories v. Forty Eight Insulations,* 658 F.Supp. 197 (S.D.N.Y.1987); *City of Manchester v. National Gypsum Co.,* 637 F.Supp. 646 (D.R.I.1986); *Corporate Air Fleet v. Gates Learjet, Inc.,* 589 F.Supp. 1076 (M.D.Tenn.1984); *County of Westchester v. General Motors Corp.,* 555 F.Supp. 290 (S.D.N.Y.1983); *Largoza v. General Elec. Co.,* 538 F.Supp. 1164 (E.D.Pa.1982); *Plainwell Paper Co., Inc. v. Pram, Inc.,* 430 F.Supp. 1386 (W.D.Pa.1977); *Waller v. Fort Dodge Laboratories,* 356 F.Supp. 413 (E.D.Mo. 1972); *Kodiak Elec. Ass'n v. Delaval Turbine, Inc.,* 694 P.2d 150 (Alaska 1984); *Salt River Project Agr. v. Westinghouse Elec.,* 143 Ariz. 368, 694 P.2d 198 (1984); *Bates & Associates, Inc. v. Romei,* 207 Ga.App. 81, 426 S.E.2d 919 (1993); *State v. Mitchell Const. Co.,* 108 Idaho 335, 699 P.2d 1349 (1985); *Nelson v. Todd's Ltd.,* 426 N.W.2d 120 (Iowa 1988); *Oak Grove Investors v. Bell & Gossett Co.,* 99 Nev. 616, 668 P.2d 1075 (1983); *Hagert v. Hatton Commodities, Inc.,* 350 N.W.2d 591 (N.D.1984); *Oklahoma Gas & Elec. v. McGraw–Edison,* 834 P.2d 980 (Okla.1992); *Northridge Co. v. W.R. Grace and Co.,* 162 Wis.2d 918, 471 N.W.2d 179 (1991).

We believe that fairness requires recovery for injuries caused to person or property resulting from unreasonably dangerous products, and that manufacturers should not be allowed to escape liability for such injuries simply because the dangerous nature of the product was undiscovered until after the warranties had expired. The purchaser is not simply losing the benefit of his bargain because of the defective nature of the product, but is sustaining damage to other property because that defect is so dangerous in nature. It would be profoundly unfair to impose the responsibility for the resulting damage upon the purchaser of the property. We do not believe a purchaser should be considered to have bargained for destruction to his property any more than he

should be considered to have bargained for physical injury to himself or others. Therefore, we hold the provisions of § 402A to be applicable in situations in which it is alleged that property damage resulted from a defect in the product which rendered the product unreasonably dangerous.

Of course, all elements of § 402A must be met. As we stated in *Phipps,* for recovery it must be established that "(1) the product was in a defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition." 278 Md. at 344, 363 A.2d 955.

■ As to Decoster's claim, we have already determined that the chickens which died when the switch allegedly malfunctioned constitute a property loss rather than an economic loss. As we stated above, in considering the legal sufficiency of the complaint to allege a cause of action for strict liability, we must assume the truth of all well-pleaded relevant and material facts and all inferences that can reasonably be drawn therefrom. *Faya, supra,* 329 Md. at 443, 620 A.2d 327; *Sharrow, supra,* 306 Md. at 768, 511 A.2d 492. As earlier noted, in its complaint Decoster alleged that it purchased the switch from Westinghouse; that the switch was released in a defective condition from Westinghouse; that the defective condition rendered it unreasonably dangerous; that the defective condition caused the injury complained of; and that the switch was expected to reach and in fact did reach Decoster without substantial change in its condition. Because Decoster's complaint sets forth allegations in support of a strict liability claim, the trial judge erred in dismissing the strict liability claim.

## III

### The Warranty Claims

Maryland Code (1975, 1992 Repl.Vol.) § 2–725 of the Commercial Law Article provides in pertinent part:

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued....

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered.

Decoster argues that the court erred in granting summary judgment on its warranty claims because, if allowed to complete discovery, it may have been able to allege the existence of a warranty for future performance which would extend the limitations period provided in § 2–725. Westinghouse avers that summary judgment was properly granted because mere speculation that such a warranty may exist is not enough to create a genuine dispute of material fact and prevent the entry of summary judgment. Westinghouse contends that its affidavit establishing that sale of the switch took place in 1979, unrebutted by evidence of any warranty of future performance, supports the granting of summary judgment based on limitations. Decoster asserts, however, that the affidavit was technically defective because it did not include a statement by the affiant that it was made upon his personal knowledge. Rather, in his affidavit, James McGill stated that the information was "true to the best of my knowledge, information and belief ...".

The standard for appellate review of a trial court's grant of summary judgment is whether the trial court was legally correct; a trial court decides issues of law, not fact, when granting summary judgment. *Rosenberg v. Helinski*, 328 Md. 664, 674, 616 A.2d 866 (1992); *Heat & Power v. Air Products*, 320 Md. 584, 591–92, 578 A.2d 1202 (1990). In order to defeat a motion for summary judgment, the opposing party must show a genuine dispute as to a material fact by proffering facts which would be admissible in evidence. *Beatty v. Trail-*

*master*, 330 Md. 726, 737, 625 A.2d 1005 (1993); *King v. Bankerd*, 303 Md. 98, 112, 492 A.2d 608 (1985). Maryland Rule 2–501 requires that when a motion is supported by an affidavit, the opposing party, in controverting any fact, must not rest merely on allegations in the pleadings but must support the response by an affidavit or other written statement under oath.

Mere speculation as to the possible existence of a factual dispute will not defeat a motion for summary judgment. *See Beatty, supra*, 330 Md. at 737, 625 A.2d 1005; *King, supra*, 303 Md. at 112, 492 A.2d 608; *Dietz v. Moore*, 277 Md. 1, 4–5, 351 A.2d 428 (1976). When the moving party has carried its burden, the party opposing summary judgment "must do more than simply show there is some metaphysical doubt as to the material facts." *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), cited with approval in *Beatty, supra*, 330 Md. at 738, 625 A.2d 1005.

In considering the summary judgment motion in this case, the trial court had before it no affidavit or other statement by Decoster to controvert the facts proffered by Westinghouse in support of its motion. Thus, if the affidavit was sufficient, we would find no error in the court's grant of the motion. Decoster argues, however, that in granting summary judgment the court denied it the opportunity of fully developing its case. It asserts that it is "not unlikely" that Westinghouse gave a warranty of future performance with the switch, and that if Decoster had been allowed to complete discovery, it may well have discovered that such a warranty had been extended. Decoster reminds us that in considering the motion for summary judgment, the trial court is required to resolve all inferences against the moving party, *Leonhart v. Atkinson*, 265 Md. 219, 220, 289 A.2d 1 (1972), and should not grant summary judgment if inquiry into facts is desirable to clarify application of law, *Lone Star Industries, Inc. v. Concrete Railroad Cross Ties Litigation*, 776 F.Supp. 206, 218 (1991). While it is true that the court has the discretion to deny a motion for summary judgment so that a more complete factual

record can be developed, it is not reversible error if the court chooses not to do so. *See Foy v. Prudential Ins. Co.,* 316 Md. 418, 424, 559 A.2d 371 (1989); *Metropolitan Mtg. Fd. v. Basiliko,* 288 Md. 25, 29, 415 A.2d 582 (1980). Therefore, acknowledging the fact that the court had the discretion to deny the motion and allow Decoster to further develop its case, we nevertheless conclude that the court was legally correct in granting the motion based on the facts proferred by Westinghouse and uncontroverted by Decoster.

Rule 2–501(c) requires that "[a]n affidavit supporting or opposing a motion for summary judgment shall be made upon personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." We have long held that to be sufficient to sustain a motion for summary judgment, an affidavit must contain language that it is made on personal knowledge, *Tellez v. Canton Railroad Co.,* 212 Md. 423, 429, 129 A.2d 809 (1957); *White v. Friel,* 210 Md. 274, 279–80, 123 A.2d 303 (1956); *Fletcher v. Flournoy,* 198 Md. 53, 58, 81 A.2d 232 (1951), *cert. denied,* 343 U.S. 917, 72 S.Ct. 649, 96 L.Ed. 1331 (1952), and that the affiant is competent to testify to the matters stated therein, *Wyand v. Patterson Agency, Inc.,* 266 Md. 456, 461, 295 A.2d 773 (1972); *Reeves v. Howar,* 244 Md. 83, 89, 222 A.2d 697 (1966); *White, supra,* 210 Md. at 279–80, 123 A.2d 303. However, we have also stated that where the issue of sufficiency is not raised below we will not consider it on appeal. *Wyand, supra,* 266 Md. at 460–61, 295 A.2d 773; *Mercier v. O'Neill Associates, Inc.,* 249 Md. 286, 287 n. 1, 239 A.2d 564 (1968).

Because Decoster failed to raise the issue of the sufficiency of Westinghouse's affidavit below, we decline now to consider it. For this reason, therefore, and because Decoster failed to set forth facts controverting those proferred by Westinghouse, we hold that the court below did not err in granting summary judgment on the warranty claims.

264

*JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR KENT COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THE VIEWS EXPRESSED IN THIS OPINION. COSTS TO BE PAID TWO–THIRDS BY APPELLEE AND ONE–THIRD BY APPELLANT.*