**PATTY PRECISION PRODUCTS COMPANY, a corporation, Plaintiff–Appellant,**

v.

**BROWN & SHARPE MANUFACTURING CO., a corporation; General Electric Company, a corporation; Tools Capital Corporation, a corporation, Defendants–Appellees.**

Nos. 86–1064, 87–1170.

United States Court of Appeals, Tenth Circuit.

May 17, 1988.

Claire V. Eagan (Frank M. Hagedorn with her, on the brief) of Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, Tulsa, Okl., for plaintiff-appellant.

Theodore Q. Eliot (Sidney G. Dunagan and James W. Rusher with him, on the brief) of Gable & Gotwals, Tulsa, Okl., for defendant-appellee, Gen. Elec. Co.

Steven A. Heath (J.C. Joyce with him, on the brief) of Blackstock, Joyce, Pollard & Montgomery, Tulsa, Okl., for defendants-appellees, Brown & Sharpe Mfg. Co. and Tools Capital Corp.

Before LOGAN, SETH and BARRETT, Circuit Judges.

BARRETT, Senior Circuit Judge.

In these consolidated appeals, Patty Precision Products Company (Patty Precision) appeals from an order of the district court denying its motion for a new trial and an order of the district court awarding appellee (General Electric) attorney fees of $170,421.54.

During April, 1974, Patty Precision was awarded a contract by the United States for the manufacture of bomb racks. Subsequently, Patty Precision contacted appellee (Brown & Sharpe) relative to the purchase of a vertical hydrotape machining center capable of producing the side plates for the bomb racks. Following its meeting

with Brown & Sharpe, Patty Precision purchased from Marsuco, Inc., a Brown & Sharpe hydrotape vertical machining center equipped with a General Electric "G.E. 550 Mark Century Numerical Control."

This machine, hereinafter referred to as "Machine # 1", was delivered to Patty Precision in January, 1975. A second machining center, "Machine # 2", also equipped with a G.E. 550 Mark Century Numerical Control, was ordered in March, 1975, and delivered to Patty Precision in June, 1975. In October, 1975, Patty Precision ordered a third machine, "Machine # 3", which was identical to machines # 1 and # 2. Machine # 3 was delivered to Patty Precision to replace Machine # 2 which had a cracked base. (R., Vol. II, Tab 297, Joint Pretrial Order, Admitted Facts, p. 4.) After Machine # 3 was delivered, Patty Precision entered into a lease agreement to lease Machine # 2. *Id.* Machines # 1 and # 3 have remained at Patty Precision's plant since their installation in 1975; Machine # 2 was replevied pursuant to an agreed order in this action in May, 1979. *Id.*

It is uncontested that during Patty Precision's initial meeting with Brown & Sharpe that a Brown & Sharpe employee specifically recommended General Electric controls, that the employee stated that Brown & Sharpe had bought over 700 controls from General Electric, and that they had a lot of confidence in the General Electric controls (R., Vol. III at pp. 135–37). It is also uncontested that after Patty Precision had ordered the machines, but prior to their delivery, that Brown & Sharpe notified General Electric of the scheduled shipment of each machine including the serial number of each General Electric control being shipped to Patty Precision, that after the machines were shipped to Patty Precision's plant General Electric employees participated in the installation and start up of each machine, and that because of the volume of controls that General Electric supplied to Brown & Sharpe, General Electric "had a service engineer basically full time at Brown & Sharpe whose job was to assist in the start up of machines and provide any feedback" from customers (R., Vol. XI at p. 1973).

From the outset, the three machines failed to perform in accordance with Patty Precision's expectations:

—In fact, because the machines needed almost constant repairs, defendants voluntarily extended the warranty period on the machines until June, 1977. Despite the alleged poor performance of the machines, plaintiff continued to use them to meet the deadlines of a government contract. After the warranties expired in June, 1977, plaintiff attempted to resolve its grievances by meeting with defendants in November, 1977. Those attempts were unsuccessful and plaintiff filed this diversity suit in May, 1978, more than three years after the purchase of the first machine.

*Patty Precision v. Brown & Sharpe Manufacturing Co., et al.,* 742 F.2d 1260, 1262 (10th Cir.1984) (*Patty Precision I*).

In its complaint, Patty Precision alleged that: Brown & Sharpe and General Electric had fraudulently induced it to purchase the machines; Brown & Sharpe and General Electric had breached numerous express and implied warranties made about the machines; and, Brown & Sharpe and Tools Capitol fraudulently induced Patty Precision to lease Machine # 2. Patty Precision specifically alleged, *inter-alia:*

With respect to said machines, defendant Brown & Sharpe, at the time of the sales and the lease, made the following express warranties: that said machines were capable of any combination of drilling, boring, tapping and milling; that said machines were capable of manufacturing one set of side plates for bomb racks in 4.6 hours. Defendants, Brown & Sharpe and GE, and each of them, made the following express warranties: that purchases or lessees of said machines, including Patty Precision, would have years of "faultless operation"; that the design features of the machines "guaranteed" simple, economical maintenance; that the GE 550 MC control would prove to be an "outstanding value"; that the GE 550 MC control was "thoroughly reliable" and had been

"thoroughly tested" with a proven design; and that the GE 550 MC control would have long life with highly reliable operation; that said machines were free of defects in materials and workmanship; and that if any such defects were found within one year of sale or lease, the same would be repaired or replaced without charge to Patty Precision. Prior to the purchase of Machines No. 1 and No. 3, and the lease of Machine No. 2 by Patty Precision, defendants Brown & Sharpe and GE made the following implied warranties: that said machines were merchantable; and that said machines were fit for the purposes of Patty Precision. R., Vol. I, Tab # 1, p. 10.

Although our record on appeal does not contain Brown & Sharpe's and Tools Capitol's answers to Patty Precision's complaint, it does contain two of General Electric's answers. Within its first answer filed March 26, 1979, General Electric alleged that Patty Precision's complaint failed to state a claim upon which relief could be granted; denied that its numerical control was in any way defective or that it fraudulently induced Patty Precision to purchase the machines; and, alleged that any loss to Patty Precision was a result of its own negligence in the operation, control, and maintenance of the machines. General Electric also counterclaimed for labor and service charges of $961.49.

On June 6, 1985, more than six years after its first answer, General Electric filed a fourth answer, just eleven days prior to the commencement of trial herein.[1] In this answer General Electric alleged, *inter alia*, that Patty Precision's claim for relief based on a breach of implied warranties was barred by the applicable statute of limitations; Patty Precision, through its agents and employees, had negligently operated and maintained the General Electric controls and the alleged breakdowns and failures were due to the acts and failures of Patty Precision; Patty Precision had waived and was estopped from asserting

any breach of express warranties relative to Machines # 2 and # 3 in view of its use of Machine # 1 prior to ordering Machines # 2 and # 3; and, no privity existed between General Electric and Patty Precision and no express warranties can exist without privity. General Electric also alleged, for the first time, that any express warranties by General Electric to Patty Precision were limited by its warranty set forth in its "Statement of Warranty and Service Policy to Worldwide Users"[2] (Statement of Warranty) and that General Electric was not liable to Patty Precision for the damages claimed in view of the damage limitation (disclaimer) set forth in its statement of warranty.

As written, General Electric's liability under its statement of warranty could not, in any case, exceed its costs of repairing or replacing defective numerical controls for a one year period.

According to the Joint Final Pretrial Order (R., Vol. II, Tab 297, p. 49), filed on June 11, 1985, six days prior to commencement of the trial, the Issues of Law Remaining to be Tried included:

Q. Did General Electric's exclusion of implied warranties to Brown & Sharpe exclude same to Plaintiff?

Q. Did General Electric's limitation of remedies for breach of warranty to Brown & Sharpe limit Plaintiff's remedies?

Trial commenced on June 17, 1985. In his opening arguments, counsel for General Electric stated:

Now, Brown & Sharpe took the [GENERAL ELECTRIC] control and interfaced it with their machining center. When these machines were sold to Brown & Sharpe there was a warranty provided. And what General Electric warranted to Brown & Sharpe was that the equipment was to be free of defects in material, workmanship and title and will be of the kind and quality designated

---

1. General Electric also apparently filed a second and third answer on March 26, 1979, and October 12, 1982. However, neither of these answers are in our record on appeal.

2. Incorporated herein as Appendix A.

and described in the contract; and that that warranty was exclusive of all other warranties, including the warranty of merchantability and of fitness for purpose; that if any defect appeared within one year of the start-up of the equipment then the company, General Electric, would correct any defect including nonconformance with specifications by repairing or replacing the parts.

R., Vol. III, pp. 62–63. Thereafter, a bench conference was held during which counsel for Patty Precision argued that counsel's remarks were irrelevant and highly prejudicial, and that General Electric's warranty created an issue of law as to whether a disclaimer can be effective to the end user when not communicated to the end user.

Following the bench conference counsel for General Electric was allowed to continue:

> Thank you, Judge. The evidence will show as to the warranty between GE and Brown & Sharpe, that the liability of GE arising out of supplying equipment does not exceed the cost of correcting the defects in the equipment, and all such liability after such corrections shall terminate.

> Now, ladies and gentlemen, the evidence will show that no representative of Patty Precision ever spoke with anyone from the General Electric Company prior to the purchase of the first machine. In fact, never spoke with anyone from the General Electric Company after the purchase of all three of these machines coupled with these controls other than service men who were at the installation or to perform service functions on the machines.

R., Vol. III, p. 66.

During the course of the trial, Patty Precision introduced extensive evidence of its problems with the machines. Patty Precision also introduced evidence that Brown & Sharpe and General Electric had extended their service warranties on the three machines until the end of June, 1977. (R., Plaintiff's Exh. 15.) Patty Precision's evidence included three notebooks, consisting of 501 pages, which contained Brown & Sharpe's machine records for Machines #1, #2 and #3. The notebooks were introduced in the exact form they were presented during discovery by Brown & Sharpe to establish the extensive repairs to the machine centers and controls over a two year period. Although these exhibits are not included in our record on appeal, the notebooks each, apparently, contained a one page copy of General Electric's statement of warranty.

During the trial, General Electric was allowed, over Patty Precision's relevancy objection, to present evidence regarding the warranty between Brown & Sharpe and General Electric covering the General Electric numerical controls utilized in Machines #1, #2 and #3. A General Electric employee testified that General Electric's warranty on the controls extended only to Brown & Sharpe and that General Electric's "warranty policy has always excluded all consequential damages and has limited it to parts and repairs or replacement only." (R., Vol. XI, p. 2134.) The employee also testified that, to his knowledge, there was never "any written document expressing a warranty given by the General Electric Company to the end user in this case, Patty Precision Products Company." (R., Vol. XI, p. 2137.)

During the instruction conference, Patty Precision renewed its objection to General Electric's introduction of evidence of its warranty and disclaimer as to Brown & Sharpe. Patty Precision also argued that the court's instructions should address its rights as a purchaser under the laws of Oklahoma to have notice of a disclaimer, and that, without notice, a disclaimer could not be binding on an ultimate consumer like Patty Precision that had purchased without notice of the disclaimer. (R., Vol. XIII, pp. 4–23.)

In its instructions to the jury the district court charged:

> Defendant General Electric further states it had disclaimed implied warranties to Brown & Sharpe and that the disclaimer to Brown & Sharpe acts as a disclaimer to plaintiff. Defendant urges plaintiff's damages, if any, are limited by

General Electric's limitation of remedies to Brown & Sharpe.

\* \* \* \* \* \*

A disclaimer of warranties is a means of controlling the liability of the seller by reducing the number of situations in which a seller can be in breach of contract terms.

A limitation of remedies clause, on the other hand, simply restricts the remedies available to the seller, the buyer or both once a breach is established.

R., Vol. XII, pp. 2259 and 2265.

At the conclusion of the trial, in response to over thirty special interrogatories incorporated into a special verdict form, the jury found that Brown & Sharpe had breached its implied warranties with respect to Machines # 1 and # 2, that Brown & Sharpe had breached its express warranties with respect to Machines # 1 and # 2, that Tools Capitol had breached its implied and express warranties with respect to Machine # 2, and that General Electric had not breached any implied or express warranties to Patty Precision on any of the machines.

The jury also found in favor of all the defendants on Patty Precision's claim for fraud/fraudulent inducement in the purchase of the machines. Based on the jury verdicts, the district court entered judgment in favor of Patty Precision against Brown & Sharpe in the amount of $154,-374.09. The court awarded Patty Precision attorney fees against Brown & Sharpe in the amount of $194,924.90. The court also awarded attorney fees in favor of General Electric against Patty Precision in the amount of $170,421.54.

Patty Precision filed a motion for a new trial. In its brief filed in support of its motion, Patty Precision alleged that the district court erred in: refusing to permit it to introduce evidence of interest paid on funds borrowed to cover costs related to the defendants' breaches of warranty; refusing to admit a summary of damages; and, failing to properly instruct on the irrelevance of General Electric's alleged disclaimer as to Patty Precision. Patty also alleged error in the jury's failure to assess

damage against Tools Capitol after Tools Capitol had breached an implied warranty.

Following review, the district court denied Patty Precision's motion. In so doing, the court, in response to Patty Precision's allegation that it had failed to properly instruct on the irrelevance of General Electric's alleged disclaimer, found:

As to error in the instructions, the Court has reviewed same and finds that taken as a whole the instructions adequately reflect the law to be applied and that the damage was not unreasonable in light of the evidence presented by all parties.

(R., Vol. II, Tab 345, p. 3.)

On appeal, Patty Precision contends in 86–1064 that the district court erred in denying its motion for a new trial and erred in (1) permitting evidence of and instructions on any disclaimer from General Electric to Brown & Sharpe and, (2) not permitting plaintiff to increase its *ad damnum* to include the amount of interest paid on funds borrowed by plaintiff in order to cover the costs it was experiencing as a result of the defendants' breaches of warranty. In 87–1170, Patty Precision contends that the district court's award of attorney's fees as taxable costs in favor of General Electric Company must be vacated if we reverse on the merits in 86–1064.

A district court has broad discretion in deciding whether to grant a motion for a new trial. *Whiteley v. OKC Corporation,* 719 F.2d 1051, 1058 (10th Cir.1983). In reviewing a district court's ruling on a motion for a new trial, a court of appeals does not make a determination of the sufficiency or weight of the evidence; rather, review is limited to whether the district court's refusal to set aside the jury's verdict constituted a manifest abuse of its discretion. *Karns v. Emerson Electric Company,* 817 F.2d 1452, 1456 (10th Cir.1987). *See also, Suggs v. State Farm Fire and Casualty Company,* 833 F.2d 883, 887 (10th Cir. 1987), *quoting Trujillo v. Goodman,* 825 F.2d 1453, 1461 (10th Cir.1987) ("[t]he decision of a trial court to grant or deny a motion for a new trial will only be over-

turned on appeal upon a showing of a 'clear abuse of discretion.' ").

When a motion for a new trial is predicated, as here, upon a challenge to the jury instructions, we consider the instructions given as a whole. *Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1549 (10th Cir.1987). In reviewing the instructions, we "consider all the jury heard, and from the standpoint of the jury, decide 'not whether the charge was faultless in every particular, but whether the jury was misled in any way and whether it had understanding of the issues and its duties to determine these issues.' " *Robinson v. Audi NSU Auto Union*, 739 F.2d 1481, 1486 (10th Cir.1984), citing *Duflinger v. Artiles*, 727 F.2d 888, 895 (10th Cir.1984), quoting *Alloy International Co. v. Hoover–NSK Bearing Co.*, 635 F.2d 1222, 1226–27 (7th Cir.1980).

Mindful of these standards, we hold that the district court's refusal to grant a new trial constituted a clear abuse of discretion.

### I.

Patty Precision contends that the district court erred in permitting evidence of and instructing on any disclaimer from General Electric to Brown & Sharpe. We agree. Patty Precision argues that General Electric's disclaimer, as set forth in its Statement of Warranty (Appendix A herein), was disclosed only to Brown & Sharpe and could not, as a matter of law, be considered effective against Patty Precision. Patty Precision also argues that since General Electric did not cross-claim against Brown & Sharpe and since General Electric's alleged disclaimer was not relevant to any claim between General Electric and Brown & Sharpe, it had no relevance to any issues involved in the case. Thus, Patty Precision contends that the introduction of evidence of and instructing on the disclaimer was misleading to the jury and prejudicial to its case.

In response, General Electric argues that its disclaimer to Brown & Sharpe was ef-fective as to Patty Precision as a subsequent purchaser and a valid defense as a matter of law. General Electric contends that "even if the defense [validity of disclaimer to Patty Precision] were not supported by the applicable law, which it is, Patty cannot claim that it was prejudiced by the admission of evidence which Patty itself sponsored." (Brief of Appellee, General Electric Company, p. 5).

The parties agree that the dispositive issue is whether General Electric's disclaimer applies to Patty Precision. The disclaimer, according to General Electric's evidence, extended only to Brown & Sharpe.[3] Patty Precision was not informed of the disclaimer prior to its purchases of the three machines, and the disclaimer was never expressed to Patty Precision in writing. The issue thus is whether the disclaimer of warranties can nonetheless be binding on Patty Precision and admissible herein. Based on our review of applicable Oklahoma law, we hold that General Electric's disclaimer to Brown & Sharpe was not binding on Patty Precision, that the disclaimer was irrelevant, and that the district court erred in admitting it in evidence and instructing on it.

### A.

Goods are considered merchantable in Oklahoma when, at the least, they are fit for the ordinary purposes for which they are used. *Perry v. Lawson Ford Tractor Company*, 613 P.2d 458, 463 (Okla.1980). Merchantability is a flexible concept which does not connote best quality or perfection in detail; merchantability does require, however, that goods operate for their ordinary purpose. *Id.* Also, where there is a breach of warranty of merchantability, it is unnecessary to determine whether a seller is liable for breach of a warranty of fitness. *American Fertilizer Specialists, Inc. v. Wood*, 635 P.2d 592, 595 (Okla.1981).

Under 12A Okla.Stat.Ann. § 2–314,[4] "Unless excluded or modified [under § 2–316] ..., a warranty that the goods shall be

---

**3.** R., Vol. XI at pp. 2134–36.

**4.** All statutory references hereinafter will be to 12A Okla.Stat.Ann. unless otherwise indicated.

merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Similarly, § 2–315 provides that "[w]hen the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified [under § 2–316] ... an implied warranty that the goods shall be fit for such purpose." Section 2–316 provides in part:

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but, subject to the provisions of this article on parol or extrinsic evidence (Section 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

Under § 2–316(1), words or conduct may be construed to negate or limit an express warranty, but negation or limitation of the warranty is inoperative to the extent that such construction is unreasonable. Under § 2–316(2), the exclusion or modification of any implied warranty of fitness "must be by a writing and conspicuous." Under § 2–201(10), conspicuous is defined as: "[a] term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it."

In assessing the validity of a disclaimer of an implied warranty under § 2–316(2), the Oklahoma courts have consistently held that the disclaimer must be in writing and conspicuous. *Collins Radio Company of Dallas v. Bell*, 623 P.2d 1039, 1049 (Okla. App.1980); *P.E.A.C.E. Corporation v. Oklahoma Natural Gas Company*, 568 P.2d 1273, 1276 (Okla.1977). We hold that Oklahoma would impose this obligation upon General Electric to an ultimate purchaser such as Patty Precision before it would accord General Electric the benefits of § 2–316.

Our holding is consistent with *Elden v. Simmons*, 631 P.2d 739 (Okla.1981) in which the Supreme Court of Oklahoma reiterated its *Old Albany Estates v. Highland Carpet Mills*, 604 P.2d 849 (Okla.1979) ruling recognizing that the U.C.C. eliminated the requirement of vertical privity in breach of warranty actions brought by ultimate consumers against builder-vendors or manufacturers. We quoted *Elden v. Simmons* extensively in *Patty Precision I* as follows:

The parties are in agreement that *Old Albany* abolished the vertical privity requirement for implied warranties. In *Elden v. Simmons*, 631 P.2d 739 (Okla. 1981), the Oklahoma Supreme Court again addressed the issue of vertical privity and implied warranties. While not necessary to reach its decision, the court made the following observation:

In reaching our holdings today, we note that the requirement of vertical privity as a prerequisite to suit on an implied or express warranty, both under the Uniform Commercial Code and outside the Code, is, given today's market structure, an antiquated notion. A manufactured product placed in the chain of distribution may literally pass through dozens of hands before it reaches the ultimate consumer. When the product is found to be defective, it makes little sense to allow the ultimate consumer redress against his immediate vendors only. If such were the case, the consumer's immediate vendor, if he were to have the full benefit of his bargain, would have to, in turn, sue *his* immediate vendor, who would, in turn, have to sue his vendor, and so on up the chain, until the party ulti-

mately responsible for placing a defective product in the market is reached. It defies common sense to require such an endless chain of litigation in order to hold the party at fault responsible. For this reason, this Court, in *Old Albany Estates v. Highland Carpet Mills, supra,* eliminate the requirement of vertical privity, thus allowing ultimate consumers to bring direct breach of warranty actions against manufacturers of products which are allegedly defective.

*Id.* at 742.

742 F.2d at 1263.

The implied warranty of merchantability has been referred to as the most important warranty in the UCC. *See,* White & Summers, *UCC 2d, HB,* § 9–6, p. 343 (1984). One of the prime goals of the Code was to do away with the requirement of privity of contract consistent with "402A of the *Restatement* which abolishes the privity requirement only in cases of property damage and personal injury." *Id.* at 407. The Code does not state that a non-privity buyer may recover for direct or consequential economic losses against a wholesaler or manufacturer in the distribution chain. A majority of the courts, in the absence of reliance on express representations, hold a non-privity buyer cannot recover for direct or consequential economic loss. *Id.* at 407, 409. In our view, the broad-sweeping language used by the Supreme Court of Oklahoma in *Old Albany Estates v. Highland Carpet Mills, supra,* reiterated and enlarged upon in *Elden v. Simmons, supra,* rejected the majority view that a "vertical" non-privity plaintiff, i.e., one who buys within the distributive chain but who does not buy directly from the defendant, cannot maintain an action for breach of implied warranty. In both *Old Albany* and *Elden v. Simmons,* the claimed economic losses were alleged to have resulted from a builder-vendor's breach of implied warranty of habitability and construction in a workmanlike manner.

We have held that a non-privity plaintiff can recover for personal injuries sustained as a result of use of defective goods based upon claimed breach of implied warranty of merchantability under the Oklahoma U.C. C. *See Whiteley v. OKC Corp., supra; Wylie v. Ford Motor Co.,* 502 F.2d 1292 (10th Cir.1974).

Thus, an ultimate consumer in the distribution chain in Oklahoma can bring a direct breach of warranty action against a manufacturer, notwithstanding his lack of privity. Since there is an implied warranty of merchantability under § 2–314 and fitness for particular use under § 2–315 unless excluded in accordance with § 2–316, we hold that General Electric's disclaimer to Brown & Sharpe, undisclosed to Patty Precision, was irrelevant and that the district court erred in admitting it into evidence and instructing on it. General Electric's evidence showed that the disclaimer extended only to Brown & Sharpe and that it was never expressed in writing to Patty Precision. Patty Precision also presented evidence that the disclaimer was not related or disclosed to it prior to its purchase of the machines.

Furthermore, General Electric was fully aware of the use to be made of the numerical controls it sold to Brown & Sharpe, which were, in turn, sold to Patty Precision as part of the machines. General Electric employees participated in the installation and start up of the machines at Patty Precision's plant. There is nothing in the record indicating that the numerical controls sold by General Electric were specially designed. Thus, the fact that they were components of a machining center used by Patty Precision does not distinguish them from any other "goods" insofar as implied warranty of merchantability is concerned. The record demonstrates that General Electric knew of the intended use of the machines by Patty Precision and the system for which the component was to be an integral part. Under these circumstances, the implied warranty of merchantability under § 2–314 applied and it was not "excluded or modified" by a conspicuous writing under § 2–316. We hold that district court erred in admitting evidence of and instructing on General Electric's Statement of Warranty.

B.

General Electric also contends that Patty Precision cannot challenge the admissibility of General Electric's statement of warranty inasmuch as Patty Precision introduced the warranty. We disagree.

█ As set forth, *supra*, Patty Precision introduced three notebooks, comprising some 501 pages, which contained Brown & Sharpe's machine records for Machines # 1, # 2 and # 3. These notebooks were introduced in the same form as they were produced during discovery by Brown & Sharpe to establish the extensive repairs to the machines. Although each of the notebooks apparently did contain a one-page copy of General Electric's Statement of Warranty, Patty Precision did not refer to the warranty at the time the notebooks were introduced nor did it prompt any testimony with respect to the disclaimer set forth in the Statement of Warranty. However, General Electric thereafter developed the disclaimer in great detail. Patty Precision consistently objected to the relevancy and admissibility of General Electric's Statement of Warranty to Brown & Sharpe.

Under such circumstances, we hold that Patty Precision did not waive its challenge to the validity of General Electric's disclaimer and the court's instructions relative thereto.

## II.

Having determined that the district court erred in admitting evidence of and instructing on General Electric's disclaimer as set forth in its statement of warranty, we need not address Patty Precision's contention that the court erred in not permitting it to increase its *ad damnum.*

## III.

The judgment in favor of Patty Precision and against Brown & Sharpe in the amount of $154,374.90 is set aside. The judgment awarding attorney fees to Patty Precision and General Electric is set aside.

REVERSED AND REMANDED for a new trial.

APPENDIX A

## STATEMENT OF WARRANTY AND SERVICE POLICY TO WORLDWIDE USERS

For General Electric Mark Century Numerical Control Sold Through Machine Builders or Their Agents

### Definition

The Mark Century Numerical Control is defined as the complete system package furnished by the Industrial Control Department for positioning, contouring and special purpose operation; which utilizes digital logic via static elements for the command and operation of machine tools. The system package may include, but is not restricted to such accessories as tape readers, feedback pickup units and servo drive components.

### Warranty to Purchaser

The Company warrants to the Purchaser that the equipment to be delivered hereunder will be free from defects in material, workmanship and title and will be of the kind and quality designated or described in the contract. The foregoing warranty is exclusive and in lieu of all other warranties whether written, oral, or implied **(including any warranty of merchantability or fitness for purpose).** If any defect in said equipment appears within one year from the day of equipment start-up, provided the start-up commences within one year from the date the equipment is shipped by the Company, and Purchaser notifies the Company promptly, the Company shall thereupon correct any defect, including non-conformance with the specifications, at its option, either by repairing any defective part or parts or by making available at the Company's plant, a repaired or replacement part. The liability of the Company to the Purchaser (except as to title) arising out of the supplying of the said equipment, or its use, whether on warranty, contract or negligence, shall not in any case exceed the cost of correcting defects in the equipment as herein provided and upon the expiration of said time period, all such liability shall

terminate. The foregoing shall constitute the sole remedy of the Purchaser and the sole liability of the Company.

**Service Policy**

Start-up service, repair services and other field services are available at additional cost from the Installation & Service Engineering Business Operation of General Electric, and General Electric Technical Services Company (GETSCO) in Europe. For all other locations contact the Industrial Control Department.

LOGAN, Circuit Judge, concurring in part and dissenting in part:

There is no dispute that the disclaimer of implied warranties by the manufacturer of the component parts, General Electric Company (G.E.), was effective against Brown & Sharpe Manufacturing Company, the first buyer, which incorporated the components into machines it fabricated and sold. The case against G.E. turns on whether the disclaimer was effective to protect G.E. from an implied warranty claim for economic loss by Patty Precision Products Company, a buyer from Brown & Sharpe unaware of the disclaimer. The majority holds that the disclaimer cannot be effective under Oklahoma law because it was not communicated to Patty Precision. Under the particular facts of this case I agree, but I have serious doubts that Oklahoma courts would deny validity to the disclaimer absent the extensive dealings between G.E. and Patty Precision. Also, I would not remand for a new trial against Brown & Sharpe. Therefore, I write separately.

The majority correctly identifies *Old Albany Estates, Ltd. v. Highland Carpet Mills, Inc.*, 604 P.2d 849 (Okla.1979), and *Elden v. Simmons*, 631 P.2d 739 (Okla. 1981), as the Oklahoma cases most closely on point. But neither involved the effect of a valid disclaimer not disclosed to a subsequent purchaser.

In *Old Albany*, the ultimate purchaser, a real estate developer, contracted for the purchase of carpet from an interior decorator; the decorator then purchased the carpet from a manufacturer. The ultimate purchaser and the manufacturer never communicated until after both contracts—the contract between the purchaser and the decorator, and the one between the decorator and the manufacturer—had become binding. The manufacturer did not disclaim any warranties in its contract with the decorator. However, the manufacturer did include written and conspicuous disclaimers in its invoices sent to the decorator, who in turn forwarded the invoices to the ultimate purchaser. The Oklahoma court held that because "[t]here existed a contract for sale of carpet prior to delivery or receipt of the invoices," 604 P.2d at 852, the disclaimers in the invoice constituted merely an offer of additional terms that did not become part of any contract. The court did hold clearly that privity between the ultimate purchaser and the manufacturer was not necessary to permit suit on implied warranties.

In contrast to *Old Albany*, the disclaimer in the case before us between G.E., a manufacturer, and the first buyer, Brown & Sharpe, was part of their contract. I think the proper reading of *Old Albany* is that it leaves open the issue whether disclaimers of warranties and limitations of remedies effective between the manufacturer and the first purchaser also may be effective against the second and successive purchasers.[1]

*Elden* applied the *Old Albany* "no privity" rule to a case involving a subsequent purchaser of a home, allowing that purchaser to sue the builder on an implied warranty of habitability and a manufacturer of bricks used in the home on an implied warranty of merchantability and fitness. As to the manufacturer the court said, "If a jury finds that a particular defective component is still under warranty, the ultimate

---

**1.** To the extent that *Old Albany* says anything about the nondisclosure problem present in this case, it implies that the ultimate purchaser could have been bound by disclaimers which were disclosed to *either* the ultimate purchaser or the first buyer: "[T]he attempted disclaimer, certainly never agreed to by Lehman [the first intermediate purchaser] or plaintiff, is not a part of the contract." 604 P.2d at 853.

consumer (the present owner) may recover against the builder and/or manufacturer of the component, if a breach of warranty is found to exist." 631 P.2d at 742. There was no disclaimer in *Elden,* but if the decision says anything about whether a disclaimer between the manufacturer and the builder would be effective against the purchaser, it implies that it might be valid.

Looking to other jurisdictions for guidance, the cases I found hold that limitations of remedies and disclaimers of warranty are binding on subsequent buyers when the first buyer adds, assembles or incorporates the manufacturer's product into another item or when the first buyer modifies or uses the manufacturer's product before resale. *See Datamatic v. International Business Machines Corp.,* 795 F.2d 458, 464–66 (5th Cir.1986) (Louisiana law); *Wood Products, Inc. v. CMI Corp.,* 651 F.Supp. 641, 651 (D.Md.1986) (dictum); *R & L Grain Co. v. Chicago Eastern Corp.,* 531 F.Supp. 201, 209 (N.D.Ill.1981); *American Electric Power Co. v. Westinghouse Electric Corp.,* 418 F.Supp. 435, 450 (S.D. N.Y.1976); *Western Equipment Co. v. Sheridan Iron Works, Inc.,* 605 P.2d 806, 810 (Wyo.1980); *Flintkote Co. v. W.W. Wilkinson, Inc.,* 220 Va. 564, 260 S.E.2d 229, 232 (1979) (dictum); *General Motors Corp. v. Halco Instruments Inc.,* 124 Ga. App. 630, 185 S.E.2d 619, 622 (1971).

Conversely, when the first purchaser was a dealer or retailer who merely held the manufacturer's product for resale without changing its form, several courts have held that, to be effective, a disclaimer must be communicated to the ultimate purchaser. *See Pennington Grain and Seed, Inc. v. Tuten,* 422 So.2d 948 (Fla.Ct.App.1982); *Groppel Co. v. U.S. Gypsum Co.,* 616 S.W. 2d 49, 60–61 (Mo.Ct.App.1981); *Peterson v. North American Plant Breeders,* 218 Neb. 258, 354 N.W.2d 625, 632 (1984) (dictum); *Nakanishi v. Foster,* 64 Wash.2d 647, 393 P.2d 635, 640 (1964). *Cf. Ford Motor Co. v. Pittman,* 227 So.2d 246 (Fla.Ct.App. 1969), *cert. denied,* 237 So.2d 177 (1970) (holding that, under Florida law, automobile manufacturer who sells to retailer for resale may not disclaim warranties to ultimate purchaser).

This distinction makes sense in commercial transactions of the sort before us. As noted by one court:

"A manufacturer who wishes to exclude warranties (to the extent permitted by the commercial law) can do so only by placing disclaiming language in the contract documents with his immediate buyer; it is commercially unreasonable to expect him to notify each ultimate purchaser (whose very identity is frequently unknown to him) of his disclaimers."

*Wood Products,* 651 F.Supp. at 651. The difficulty of notifying ultimate purchasers is exacerbated if the manufacturer has produced a component rather than a finished product. Components are often hidden within the finished product, making it difficult or impossible for the manufacturer to notify ultimate purchasers by posting disclaimers on the product itself. Further, while the manufacturer before us, G.E., may be economically powerful enough to require someone like Brown & Sharpe to notify all purchasers of the warranty limitation, the typical component part manufacturer will be selling to a larger entity which it cannot reasonably be expected to control. In contrast, the problem of notice is less severe with a finished product which the middleman holds only for resale; the manufacturer frequently can notify the ultimate purchaser simply by affixing a copy of the disclaimer to the product. *See Groppel Co.,* 616 S.W.2d at 60–61.

I can see how a court might invalidate a manufacturer's warranty or remedy limitations for a product that is dangerous and causes personal injury. But for ordinary transactions in the stream of commerce, where failure of the product causes only economic loss, the policy objectives of protecting the ultimate purchaser are not as compelling. In most cases the ultimate purchaser's cause of action against his immediate seller should be sufficient protection. The U.C.C. recognizes that disclaimers can be effective between contracting parties. *See* Okla.Stat.Ann. tit. 12A, § 2–316. If the benefits of warranties pass without regard to privity, as *Old Albany* and *Elden* hold, it seems reasonable—at

least in cases involving only economic loss and not involving consumer goods—that disclaimers which are effective between the original parties should also bind "anyone asserting the liability of a defendant on a warranty that would exist but for the disclaimer." 3 R. Anderson, *Anderson on the Uniform Commercial Code* § 2–316:54, at 361–62 (3d ed. 1983).

Having said this, I nevertheless agree with the majority that under the particular circumstances of the instant case G.E.'s disclaimer should not be valid against Patty Precision because G.E. did not communicate the disclaimer to Patty Precision. As the majority opinion recites, the contract for the first machine was executed before G.E. commenced dealing directly with Patty Precision. But G.E. had extensive dealings with Patty Precision in the installation of that machine and before subsequent purchase orders were executed. It had a service engineer on the premises almost full time, and it extended express warranties to Patty Precision. Its participation, I believe, induced Patty Precision's reliance on warranties and went beyond mere aid in making adjustments to satisfy its customer, Brown & Sharpe. *See Nakanishi*, 393 P.2d at 640. Under these circumstances, it is not commercially unreasonable to expect G.E. to communicate in clear and conspicuous language its disclaimer of implied warranties to Patty Precision. *See Wood Products*, 651 F.Supp. at 651. I agree that by failing to communicate the disclaimer during all of these dealings with Patty Precision G.E. waived the disclaimer defense or is estopped from raising it.

Nevertheless, I must dissent from the majority's order of a new trial on Patty Precision's claims against Brown & Sharpe. The jury found that Brown & Sharpe breached express and implied warranties to Patty Precision with respect to two of the machines. I cannot understand how the admission of evidence about General Electric's disclaimer of warranties to Brown & Sharpe possibly could have prejudiced Brown & Sharpe in its defense against Patty Precision. That Patty Precision requests a new trial as to all claims in the case is no ground for directing a new trial for the claims against Brown & Sharpe.

I agree with the reversal as to G.E., but would affirm the district court on the judgment against Brown & Sharpe.